[No. A080694. First Dist., Div. Two. Nov. 16, 1998.]

ANTI-DEFAMATION LEAGUE OF B'NAI B'RITH et al., Petitioners, v. THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, Respondent; AUDREY SHABBAS et al., Real Parties in Interest.

1074

1076

---

COUNSEL

Heller, Ehrman, White & McAuliffe and David M. Goldstein for Petitioners.

No appearance for Respondent.

Audrey Shabbas, in pro. per., and for Real Parties in Interest.

## OPINION

**KLINE, P. J.**—The underlying issue in this case relates to the right to privacy. Whether that right was violated cannot be determined, however, without the disclosure of relevant evidence. The question before us now is whether such disclosure can be compelled without violence to the First Amendment values requiring protection of a journalist's confidential sources and information.

Petitioners Anti-Defamation League of B'nai B'rith (ADL) and Roy Bullock seek to set aside a discovery order issued by respondent superior court (Judge Alex Saldamando) on September 19, 1997, granting reconsideration and ordering compliance with certain discovery requests by real parties in interest after finding that they have now met the criteria set forth in *Mitchell* v. *Superior Court* (1984) 37 Cal.3d 268 [208 Cal.Rptr. 152, 690 P.2d 625], to overcome the journalist's qualified privilege. Respondent court stayed the effect of its order pending final determination of this writ petition. Initially, this court denied the petition without opinion. Thereafter, the Supreme Court directed us to issue an order to show cause and to place the matter on calendar.

As explained hereafter, we hold that petitioners, as journalists, are immune from liability for violating Civil Code section 1798.53 under the First Amendment as to all but one and possibly two other real parties in interest by virtue of their status as limited purpose public figures. As to the remaining nonpublic figure or figures, petitioners are not protected by the First Amendment from liability and a discovery order.

Petitioners are entitled to the protection of the First Amendment, however, only insofar as the information sought to be discovered was obtained and used by them for legitimate journalistic purposes. The journalist's privilege would not protect against discovery directed to whether any nonpublic information gathered about real parties in interest was privately disclosed to a foreign government or others in violation of Civil Code section 1798.53, as claimed, because such usage does not constitute journalism. The discovery order issued by the trial court was not so limited. The order must therefore be vacated and the matter remanded for reconsideration in light of our opinion.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioners ADL and Roy Bullock, along with Richard Hirschhaut and Thomas Gerard, are defendants in an action brought by real parties in

interest for invasion of privacy in violation of Civil Code section 1798.53. Defendant Hirschhaut was the director of ADL's office in San Francisco; defendant Bullock has been a paid "fact-finder" for ADL for the past 32 years; and defendant Gerard was employed by the San Francisco Police Department. The complaint alleges that defendants secretly gathered and disclosed personal information about real parties in interest, 17 individuals, in violation of Civil Code section 1798.53 because of their expressed views in opposition to the apartheid policy of the then-government of South Africa and/or Israeli policies vis-à-vis the Palestinians.

Real parties learned of defendants' activities as a result of an investigation conducted by the San Francisco District Attorney and the police department. The district attorney commenced the investigation in 1993 after the police department learned that one or more of its officers might have been improperly providing confidential government information to Bullock, who was employed by ADL to investigate organizations opposing the aforesaid policies of the governments of Israel and South Africa.

At the conclusion of his investigation, the district attorney determined that Bullock and/or ADL had solicited and received government information not made public from San Francisco police officers and others. In November 1993, the district attorney commenced a civil action against ADL and Bullock alleging violation of Business and Professions Code section 17200.[1] That action was settled after ADL agreed to a permanent injunction prohibiting ADL and Bullock from obtaining documents or other information they know could not legally be disclosed to them. Real parties in interest, who commenced this action in April 1993, claim that nonpublic information contained in government records relating to each of them was improperly obtained and disclosed to others by ADL.

■ Civil Code section 1798.53 is part of the Information Practices Act of 1977, which generally imposes limitations on the right of governmental entities to disclose personal information about an individual. (*Nicholson* v. *McClatchy Newspapers* (1986) 177 Cal.App.3d 509, 514, fn. 2 [223 Cal.Rptr.

---

[1] Section 17200 of the Business and Professions Code defines "unfair competition" as including "any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Section 17500 makes it "unlawful" for "any person, firm, corporation or association . . . to make or disseminate or cause to be made or disseminated . . . any statement, concerning . . . real or personal property or services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."

58].) The statute was designed by the Legislature to prevent misuse of the increasing amount of information about citizens which government agencies amass in the course of their multifarious activities, the disclosure of which could be embarrassing or otherwise prejudicial to individuals or organizations.[2] Indeed, the Legislature made express findings to that effect: "(a) The right to privacy is being threatened by the indiscriminate collection, maintenance, and dissemination of personal information and the lack of effective laws and legal remedies. [¶] (b) The increasing use of computers and other sophisticated information technology has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information. [¶] (c) In order to protect the privacy of individuals, it is necessary that the maintenance and dissemination of personal information be subject to strict limits." (Civ. Code, § 1798.1.)

Civil Code section 1798.53 is a key remedial provision of the Information Practices Act. It provides a civil cause of action for damages against any "person, other than an employee of the state or of a local government agency acting solely in his or her official capacity, who intentionally discloses information, not otherwise public, which they know or should reasonably know was obtained from personal information maintained by a state agency or from 'records' within a 'system of records' (as these terms are defined in the Federal Privacy Act of 1974) . . . maintained by a federal government agency. . . ." Civil Code section 1798.53 additionally authorizes an award of exemplary damages of at least $2,500 and attorney's fees and costs to a successful plaintiff.

On June 10, 1993, real parties served their first demand for production and inspection of documents. ADL moved for a protective order on the ground that ADL is a journalist protected by the qualified journalist's privilege set forth in *Mitchell* v. *Superior Court, supra,* 37 Cal.3d 268. After a lengthy hearing on the motion, the court (Judge Barbara Jones) ruled on November 17, 1993, that ADL, which publishes magazines and newsletters, qualified as

---

[2]"Authorities trace the crisis of informational privacy in government records to a number of factors: (1) government's increased role in the lives of individuals through its provision of benefits and services and its regulation of the activities of private and public organizations; (2) an increasingly complex government bureaucracy's reliance on written records, rather than face-to-face contact or direct evaluation, for decisionmaking; (3) the vogue of behavior-predictive theories of decisionmaking, which presume that a maximum amount of information will allow fine-grained distinctions in decisions and predictions as to future behavior; and (4) the unprecedented technological revolution in information handling, storage, transfer, and manipulation." (Note, *California's Privacy Act: Controlling Government's Use of Information?* (1980) 32 Stan. L.Rev. 1001, fn. 2, citing, inter alia, Statewide Information Policy Com., Cal. State Assem., Final Rep. No. 21-27, (1970), reprinted in 1 Appen. to Assem. J. (1970 Reg. Sess.)

a journalist, and that ruling is not now disputed. The court granted ADL's motion for a protective order and denied real parties' document request as then phrased on the ground that the latter had failed to satisfy the criteria set forth in *Mitchell v. Superior Court, supra,* 37 Cal.3d 268. The order stated the court would reconsider the matter if real parties reformulated the document requests and were unsuccessful in obtaining the information from alternative sources.

Real parties continued their discovery attempts. On November 19, 1993, they served a second document request on ADL. On November 24, 1993, real parties served the San Francisco District Attorney with a subpoena for documents referring to specified persons and organizations that had been seized by the police department during its investigation of ADL. On April 6, 1994, the court granted ADL's motion to quash the subpoena "with respect to any documents that originated with ADL or Bullock, or that were obtained, procured or developed by ADL or Bullock." In September 1994, the court ordered Bullock to appear for deposition to explore only information not within the ambit of the journalist's privilege set forth in *Mitchell* and to produce certain documents. Discovery of other categories of documents was stayed "without prejudice unless and until plaintiffs have established, pursuant to *Mitchell,* their entitlement to proceed with discovery of matters protected by the journalist's privilege."

■ *Mitchell v. Superior Court, supra,* 37 Cal.3d 268, holds that there is a qualified journalist's privilege in a civil action to refuse to reveal confidential sources or information obtained from those sources and that the scope of the privilege depends upon a weighing of five factors.

The first is the nature of the litigation and whether the reporter is a party. "In general, disclosure is appropriate in civil cases, especially when the reporter is a party to the litigation." (37 Cal.3d at p. 279.) "A second consideration is the relevance of the information sought to plaintiff's cause of action. . . . [M]ere relevance is insufficient to compel discovery; disclosure should be denied unless the information goes 'to the heart of the plaintiff's claim.' " (*Id.* at p. 280.) Third, discovery should be denied unless the plaintiff has exhausted all alternative sources of obtaining the needed information. Fourth, the court should consider the importance of protecting confidentiality in the case at hand. (*Id.* at p. 282.) "Finally, the court may require the plaintiff to make a prima facie showing that the alleged defamatory statements are false before requiring disclosure." (*Id.* at p. 283.)

In June 1996, real parties sought reconsideration of the earlier limitations on discovery, arguing that they had now satisfied the *Mitchell* criteria.[3] Specifically, they asked the court to order (1) ADL to produce documents in response to their third document request, (2) reissuance of the subpoena duces tecum to the police department, and (3) Irwin Suall to answer certain questions and to produce documents listed in his notice of deposition. Real parties' memorandum of points and authorities recited the efforts undertaken since the earlier ruling: They took the depositions of defendants Gerard, Bullock and Hirschhaut, San Diego Sheriff's Deputy Tim Carroll, San Francisco Police Lieutenant Ron Roth, former Israeli Mossad Agent Victor Ostrovsky and ADL's fact-finding director, Irwin Suall. Real parties had reframed their document requests to seek information solely about plaintiffs and members of the putative class.[4] Despite an order allowing real parties to ascertain the job assignments of Roy Bullock, ADL refused to produce documents or allow Irwin Suall, who made 95 percent of those job assignments, to identify them.

In their memorandum of points and authorities in support of the request for reconsideration, respondents characterized the facts that had emerged from their discovery as follows: (1) Bullock, with Hirschhaut's knowledge and under Suall's direction, solicited and received confidential information including driver's license numbers and post office box numbers from law enforcement officers; (2) up to half of ADL's efforts during 1986 to 1993 were directed to obtaining information about individuals such as real parties in interest and organizations holding views opposing Israel's policies or apartheid in South Africa; (3) of the ADL files in police possession, some seven and one-half boxes contain illegally obtained confidential information about individuals and organizations; (4) Bullock and/or Hirschhaut admitted that ADL or its agents gave information to the Government of Israel and sold information to the government of South Africa; (5) from 1986 to 1993, Bullock and Hirschhaut transmitted hundreds of reports to Suall and other ADL offices that included information from confidential sources or "official friends" (law enforcement officers); (6) ADL routinely provided information on individuals, including real party in interest Yigal Arens, to the greater

---

[3]The motion, memorandum of points and authorities, and declarations in opposition to the motion are included in the documents that we had ordered sealed pursuant to ADL's request. It would be nearly impossible, however, to write a meaningful opinion reviewing the court's discovery order without referring to the documents supporting and opposing the ruling. In response to our inquiry at oral argument, ADL consented to unsealing all exhibits we had previously ordered sealed. Accordingly, we hereby order exhibits 36-38, 43, 44, 45, 46, and 49 unsealed.

[4]On March 3, 1997, respondent court entered a stipulated order stating, inter alia, that the "pending discovery motions shall pertain only to the 17 individual plaintiffs, and not to the putative class they purport to represent."

community of 12,000 ADL supporters in the Bay Area, characterizing those opposed to Israel as propagandists using their anti-Zionism as a guise for deeply felt anti-Semitism; (7) ADL's files seized by the police contained information from confidential government files on real parties in interest Steven Zeltzer and Jeffrey Blankfort; (8) information on real party in interest Helen McCloskey in ADL's files contained information that appeared to have come from the government of Israel; and (9) ADL's head fact-finder, Irwin Suall, had met with the Israeli intelligence officials in Israel.

Respondent court heard argument on the motion to reconsider on June 27, 1997, and filed its written order on September 19, 1997. The court found that real parties had met the criteria of *Mitchell*: (1) the newsgatherers are parties to the action; (2) the information goes to the heart of real parties' case in that it will identify the source of illegally obtained information admittedly obtained by ADL and the dissemination, if any, of such information in violation of Civil Code section 1798.53 and article I, section 1, of the California Constitution; (3) real parties have exhausted all reasonable alternative sources of information and do not have any practical way of obtaining such information from sources other than defendants and the San Francisco Police Department; (4) the nonpublic information to be disclosed does not relate to public figures or refer to matters of great public importance that would justify nondisclosure under *Nicholson* v. *McClatchy Newspaper Co., supra,* 177 Cal.App.3d 509; (5) plaintiffs have presented a prima facie case that defendants Bullock, Hirschhaut and ADL have illegally solicited, obtained and transmitted Civil Code section 1798.53 information in the cases of plaintiffs Blankfort and Zeltzer, and there is a reasonable probability that they have done so in the case of the other named plaintiffs.

The court ordered the following discovery: (A) reissuance of the subpoena duces tecum to the San Francisco Police Department and "in response to such subpoena the San Francisco Police Department shall produce for Plaintiffs' inspection and copying subject to the Protective Order herein all non-public information obtained by ADL from public agents which is contained in the ADL records seized by the Police Department in 1992 and 1993." The parties are authorized to select a discovery referee or master to be compensated by the parties to supervise and monitor the production of the seized records. (B) ADL is to fully respond to plaintiffs' third document request within 20 days by producing the following documents: "(1) all memoranda or documents describing or relating to the work assignments of Roy Bullock from Irwin Suall which involve police or other public agents; (2) each document containing illegally-obtained non-public information relating to Plaintiffs and individuals or organizations in their putative class as

described by Lt. Roth; (3) each item of non-public information gathered or acquired by ADL and/or Bullock which refer or relate to any of the named Plaintiffs; (4) each ADL publication distributed outside the ADL which includes the name of a Plaintiff or spouse; (5) all 'pink' reports [indicating information had come from confidential informant] dating from 1988 to 1993 transmitted from San Francisco as described by Bullock which contain or refer to non-public information about Plaintiffs' or members of organization in their putative class; (6) any ADL communications to the ADL, 'Jewish or larger community' identified by Mr. Hirschhaut in his deposition which referred to Plaintiffs or their class; and (7) a roster of the ADL 'community' as identified by Mr. Hirschhaut." (C) Irwin Suall was to answer in writing within 20 days specified questions that had been propounded to him at his deposition in April 1996, and he was to produce any documents demanded of him in his notice of deposition that are in his possession and have not been previously produced. (D) The time for Victor Ostrosky to comply with the request to produce documents not within the journalist's privilege was extended to 60 days following completion of the deposition of Irwin Suall.

## II. DISCUSSION

■ Petitioners mount two challenges to the superior court's ruling. First they argue that discovery from ADL may not be compelled because ADL cannot, consistent with free press guarantees, be liable under Civil Code section 1798.53. ■ Petitioners' second argument is that respondent court erred in finding that real parties in interest had now met the *Mitchell* criteria to overcome the qualified privilege.[5]

### A.

■ Turning first to the question of immunity, petitioners maintain that Civil Code section 1798.53 must give way to a journalist's free press rights, including the right to ask for, receive and publish confidential information from government sources.

■ *Mitchell* clearly does not provide journalists an absolute immunity. "When called upon to weigh the fundamental values arguing both for and

---

[5]Petitioners acknowledge in their petition that the only matter before the trial court on the motion for reconsideration was ADL's objection based on the journalist's privilege and that their other objections to discovery are still outstanding and may be addressed after resolution of this petition. Thus, petitioners' objection to the order to produce "a roster of the ADL 'community' as identified by Mr. Hirschhaut" on First Amendment freedom of association grounds (*N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449 [78 S.Ct. 1163, 2 L.Ed.2d 1488]; *Britt* v. *Superior Court* (1978) 20 Cal.3d 844 [143 Cal.Rptr. 695, 574 P.2d 766]) may be addressed, if necessary, and resolved upon termination of these proceedings.

against compelled disclosure, the overwhelming majority of courts have concluded that the question of a reporter's privilege in civil cases must be decided on a case-by-case basis, with the trial court examining and balancing the asserted interests in light of the facts of the case before it. Thus, the courts conclude, there is neither an absolute duty to disclose nor an absolute privilege to withhold, but instead a qualified privilege against compelled disclosure which depends on the facts of each particular case. [Citations.]" . (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d at p. 276.)

Petitioners maintain that the weighing undertaken by the trial court in this case cannot be squared with a series of assertedly similar cases in which it was found that disclosure could not be punished. They rely on *Nicholson* v. *McClatchy Newspapers, supra,* 177 Cal.App.3d 509; *Alim* v. *Superior Court* (1986) 185 Cal.App.3d 144 [229 Cal.Rptr. 599]; *Landmark Communications, Inc.* v. *Virginia* (1978) 435 U.S. 829 [98 S.Ct. 1535, 56 L.Ed.2d 1]; and *The Florida Star* v. *B. J. F.* (1989) 491 U.S. 524 [109 S.Ct. 2603, 105 L.Ed.2d 443]. Petitioners also find support in the California Supreme Court's recent opinion in *Shulman* v. *Group W Productions, Inc.* (1998) 18 Cal.4th 200 [74 Cal.Rptr.2d 843, 955 P.2d 469]. Real parties in interest respond that the cited cases are all manifestly distinguishable on their facts; and, indeed, that the cases petitioners rely upon actually support disclosure in the different circumstances presented in this case.

In *Nicholson,* an unsuccessful candidate for Attorney General sued the State Bar, two newspapers, and their reporters for damages arising from the publication of the unauthorized disclosure of the confidential fact that the Commission on Judicial Nominees Evaluation had found him not qualified for judicial appointment. The causes of action asserted against the media defendants included one for breach of Civil Code section 1798.53 and one for breach of the common law right of privacy by intrusion. The trial court found that the publication was constitutionally privileged and sustained the media defendants' demurrers without leave to amend. The Court of Appeal affirmed, noting that the allegations as to the media defendants were only that they had sought out newsworthy information which they subsequently published. Such allegations were insufficient to avoid the effect of the constitutional privilege. (177 Cal.App.3d at p. 520.) There was no allegation of impermissible reporting techniques.[6] The plaintiff was a public figure since he had recently run for statewide office, and the evaluation of the

---

[6]The cause of action for breach of privacy by intrusion alleged that the defendants " 'pursued and conducted an unreasonably intrusive investigation into Plaintiff's confidential and private affairs by means of soliciting, inquiring, requesting and persuading agents, employees and members of the STATE BAR to engage in the unauthorized and unlawful

judicial qualifications was a newsworthy subject. (*Id.* at p. 515.) "While the government may desire to keep some proceedings confidential and may impose the duty upon participants to maintain confidentiality, it may not impose criminal or civil liability upon the press for obtaining and publishing newsworthy information through routine reporting techniques." (*Id.* at pp. 519-520.) The court observed that although reporters are not privileged to commit crimes and independent torts in gathering the news, there was no allegation that any such impermissible techniques had been employed. (*Ibid*).

In *Alim* v. *Superior Court, supra*, 185 Cal.App.3d 144, Walter Atlee, former chief deputy director of the Department of Veterans Affairs, sued a newspaper reporter, editor and publisher for invasion of privacy under Civil Code section 1798.53 and libel based on an article containing allegedly false and confidential information from federal Veterans Administration records indicating that he had wrongfully received overpayments of a veteran's disability stipend while employed. The trial court granted the newspaper defendants' motion for summary judgment on all causes of action but that under Civil Code section 1798.53 on the ground that Atlee, who was a public figure, could not prove malice under the *New York Times* doctrine. (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412].) The trial court denied summary judgment on the Civil Code section 1798.53 claim on the ground that the constitutional doctrine did not apply to it. The Court of Appeal disagreed, rejecting the claim that an action under Civil Code section 1798.53 is not subject to free press defenses analogous to those available in common law actions for invasion of privacy. ■ The court held that a cause of action under Civil Code section 1798.53 is subject to the *New York Times* actual malice standard and that there is a privilege for truthful publication of information bearing on the fitness for office of a public official. (185 Cal.App.3d at pp. 152-153.)

In *Landmark Communications, Inc.* v. *Virginia, supra*, 435 U.S. 829, the Supreme Court held that the First Amendment did not permit the criminal punishment of a newspaper for publishing truthful information regarding confidential proceedings of the Virginia Judicial Inquiry and Review Commission. "The operation of the Virginia Commission, no less than the operation of the judicial system itself, is a matter of public interest, necessarily engaging the attention of the news media. The article published by Landmark provided accurate factual information about a legislatively authorized inquiry pending before the Judicial Inquiry and Review Commission,

disclosure of information [knowing such information to be confidential].' " (*Nicholson* v. *McClatchy Newspapers, supra,* 177 Cal.App.3d at p. 520.)

and in so doing clearly served those interests in public scrutiny and discussion of governmental affairs which the First Amendment was adopted to protect." (*Id.* at p. 839 [98 S.Ct. at p. 1542].) The court specifically noted, however, that the case did not involve "the possible applicability of the statute to one who secures the information by illegal means and thereafter divulges it. We do not have before us any constitutional challenge to a State's power to keep the Commission's proceedings confidential or to punish participants for breach of this mandate." (*Id.* at p. 837 [98 S.Ct. at pp. 1540-1541].) The only issue before the court was whether a newspaper could be punished for publishing truthful information about confidential proceedings. (*Ibid.*)

*The Florida Star* v. *B. J. F.*, supra, 491 U.S. 524, held that a newspaper could not be held liable for violating a state statute prohibiting the publishing of a rape victim's name which it had obtained from a publicly released police report. The court emphasized that its holding was limited to the situation in which the newspaper published truthful information that had been lawfully obtained. (*Id.* at p. 541 [109 S.Ct. at p. 2613].) The court expressly noted it was not addressing the question of whether a newspaper may ever be punished for publishing information that had been unlawfully acquired. (*Id.* at p. 535, fn. 8 [109 S.Ct. at p. 2610].)

*Shulman* v. *Group W Productions, Inc.*, supra, 18 Cal.4th 200, addressed the common law invasion of privacy torts of public disclosure of private facts and intrusion in an action brought by two automobile accident victims against a television producer that videotaped and broadcast a documentary rescue program showing the plaintiffs' rescue and transportation to the hospital in a medical helicopter. The court held that summary judgment was proper as to the cause of action for publication of private facts but not as to the cause of action for intrusion. Lack of newsworthiness was held to be an essential element of a cause of action based on a claim that publication has given unwanted publicity to allegedly private aspects of a person's life. The subject matter of the broadcast as a whole was of legitimate public concern. "Automobile accidents are by their nature of interest to that great portion of the public that travels frequently by automobile. The rescue and medical treatment of accident victims is also of legitimate concern to much of the public, involving as it does a critical service that any member of the public may someday need." (*Id.* at p. 228.) Likewise, the victim's appearance and words as she was extricated from the overturned car, placed in the helicopter, and transported to the hospital were of legitimate public concern. The intrusion cause of action, by contrast, was held not to carry any special immunity or privilege for the press. ■ "In contrast to the broad privilege

the press enjoys for publishing truthful, newsworthy information in its possession, the press has *no* recognized constitutional privilege to violate generally applicable laws in pursuit of material. Nor, even absent an independent crime or tort, can a highly offensive intrusion into a private place, conversation, or source of information generally be justified by the plea that the intruder hoped thereby to get good material for a news story." (*Id.* at p. 242, italics in original.) Thus, summary judgment was improper as to the cause of action for intrusion based on the cameraman's presence in the medical helicopter and the recording and amplifying of the victim's conversations with medical personnel. (*Id.* at pp. 237-238.)

The trial court found that the cases just discussed were inapplicable because they involved newsworthy information, plaintiffs who were public figures, or both. According to the trial court, the nonpublic information gathered about real parties was not newsworthy, and real parties were not public figures. Petitioners challenge these determinations, arguing that real parties are political activists visibly engaged in public opposition to policies of the Israeli government and have therefore made themselves limited purpose public figures.

Petitioners rely primarily on *Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244 [208 Cal.Rptr. 137, 690 P.2d 610]; *Copp* v. *Paxton* (1996) 45 Cal.App.4th 829 [52 Cal.Rptr.2d 831]; and *Lind* v. *Grimmer* (9th Cir. 1994) 30 F.3d 1115. After reviewing these authorities and the information provided in the exhibits relating to the political activities that real parties in interest have undertaken, we agree that at least 14 and possibly 16 of the 17 real parties in interest must be considered limited purpose public figures in relation to this litigation.

The leading California case on public figures is *Reader's Digest Assn.* v. *Superior Court, supra*, 37 Cal.3d at pages 254-255, where Synanon, a rehabilitation program for drug addicts, and Charles Dederich, its founder, were held to be public figures by virtue of their myriad attempts to thrust their case and Synanon in general into the public eye. In reaching that conclusion, the court traced the evolution of the public figure doctrine, noting that it was first recognized in *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130 [87 S.Ct. 1975, 18 L.Ed.2d 1094], and subsequently refined in *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed.2d 789], where ". . . the court provided a twofold rationale for extending the *New York Times* rule to 'public figures.' First, it recognized that public figures are generally less vulnerable to injury from defamation because of their ability to resort to effective 'self help.' Such persons ordinarily enjoy

considerably greater access than private individuals to the media and other channels of communication. This access in turn enables them to counter criticism and to expose the fallacies of defamatory statements. (418 U.S. at p. 344 [41 L.Ed.2d at p. 808].) Second, and more significantly, the court cited a normative consideration that public figures are less deserving of protection than private persons because public figures, like public officials, have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.' (418 U.S. at p. 345 [41 L.Ed.2d at p. 808]; see also *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. at p. 164 [18 L.Ed.2d at p. 808] (Warren, C. J., conc. in result).)" (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 253.)

"Having thus explained the rationale for the public figure classification, the *Gertz* decision defined two classes of public figures. The first is the 'all purpose' public figure who has 'achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.' The second category is that of the 'limited purpose' or 'vortex' public figure, an individual who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.' (418 U.S. at p. 351 [41 L.Ed.2d at p. 812].) Unlike the 'all purpose' public figure, the 'limited purpose' public figure loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public controversy." (*Reader's Digest Assn.* v. *Superior* Court, *supra,* 37 Cal.3d at pp. 253-254.)

In determining that Synanon and Dederich must be accorded public figure status for purposes of their defamation action, the court based its conclusion on their efforts to thrust themselves into the public eye. Synanon and Dederich had been the subject of a full-length commercial movie, four books, favorable magazine articles in *Life, Time* and even *Reader's Digest,* and numerous newspaper articles. "For many years Synanon engaged in extensive publicity campaigns in which it sought and achieved a favorable reputation as an organization for the rehabilitation of drug addicts." (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal. 3d at p. 255.) The court concluded: "While any person or organization has the right to engage in publicity efforts and to attempt to influence public and media opinion regarding their cause, such significant, voluntary efforts to inject oneself into the public arena require that such a person or organization be classified as a public figure in any related defamation actions." (*Id.* at p. 256.)[7]

In *Copp* v. *Paxton, supra,* 45 Cal.App.4th 829, a self-proclaimed earthquake expert undertook efforts to organize a worldwide conference on

---

[7]The California Supreme Court recently addressed the definition of a public figure for purposes of tort and First Amendment law in *Khawar* v. *Globe Internat., Inc.* (1998) 19

disaster mitigation. In connection with his efforts he took issue with the conventional duck-and-cover advice given to schoolchildren and distributed a flyer describing his views. After being subjected to public criticism and attacks on his credentials, Copp brought an action for defamation against a county emergency services officer and others. Our colleagues in Division One of this court concluded that Copp was a limited purpose public figure because he had attempted to thrust himself into the forefront of debate on emergency preparedness by organizing a worldwide conference, passing out flyers and speaking at public meetings. (*Id.* at p. 846.) In reaching this conclusion, the court observed: "It is not necessary to show that a plaintiff actually achieves prominence in the public debate; it is sufficient that '[a plaintiff] attempts to thrust himself into the public eye' (*Rudnick* v. *McMillan* (1994) 25 Cal.App.4th 1183, 1190 [31 Cal.Rptr.2d 193]) or to influence a public decision." (*Id.* at pp. 845-846.)

In *Lind* v. *Grimmer, supra,* 30 F.3d 1115, a newsletter publisher brought an action challenging the constitutionality of a Hawaii statute prohibiting disclosure of information concerning investigations undertaken by Hawaii's Campaign Spending Commission. The Ninth Circuit held the statute unconstitutional as applied to Lind who revealed in a newsletter that he had filed a complaint against the University of Hawaii professional assembly alleging it had failed to disclose certain campaign contributions. The court rejected Hawaii's claim that it was justified in restricting political speech about complaints before the Campaign Spending Commission in order to promote other political speech by candidates and their supporters. The court observed that candidates "surely are public figures, and therefore must be prepared to endure a heightened level of criticism—including charges of campaign spending improprieties—precisely in order to promote First Amendment values. . . . Candidates' supporters, by injecting themselves into public debate and attempting financially to influence its outcome, also must be prepared to suffer what to them may be unpleasant discussion of their contribution practices." (*Lind* v. *Grimmer, supra,* 30 F.3d at p. 1120.)

 Petitioners contend that real parties have sufficiently injected themselves into the maelstrom of public debate over Israeli-Palestinian relations and other topical issues to qualify as limited purpose public figures. As

Cal.4th 254 [79 Cal.Rptr.2d 178, 965 P.2d 696] where it held that plaintiff Khawar, who was photographed near Senator Robert Kennedy shortly before the senator's assassination, was not a public figure. Khawar's appearance near Kennedy was not conduct by which he thrust himself into the limelight in an attempt to influence the resolution of issues. Mere association with a matter that attracts public attention, such as Senator Kennedy's candidacy, does not transform one into a public figure in the absence of some purposeful activity to invite public comment or to influence the public with relation to some issue. (*Id.* at pp. 266-269.)

examples, they cite declarations and interrogatory responses submitted by real parties Jeffrey Blankfort and Steven Zeltzer (whom the trial court found to have made out prima facie cases of violation of their rights under the privacy statute) describing their interest and activities in support of Palestine and in speaking out against Israeli policies and against apartheid in South Africa. Blankfort stated: In 1981 he was a charter member of the November 29th Coalition for Palestine; in June 1982 he solicited names and funds for an ad in the San Francisco Chronicle and Examiner protesting the Israeli invasion of Lebanon; in 1983, he spent four months in Israel, Lebanon, Jordan and the West Bank as a free-lance photojournalist; in January 1987, he organized an anti-apartheid demonstration in San Francisco; in May 1987, he and Steve Zeltzer organized a forum on the Middle East at a church; in November 1989, he spoke at a conference in Boston on the connection between Israel and South Africa; he spoke on Israeli censorship in June 1993 at a meeting of the American Library Association; he is the editor of the Middle East Labor Bulletin. Zeltzer recited similar activities: He helped Blankfort form the Labor Committee on the Middle East in 1987 whose purpose was to provide information to the United States workers about the conditions of working people of the Middle East and to counter anti-Arab racism in the United States; in the early 1980's he helped form the Committee to Free Moses Mayekiso, a South African who had been jailed because of his union activities in defense of Black South African workers.

We agree that the activities undertaken by Blankfort and Zeltzer are sufficient to make them limited purpose public figures under the authorities previously discussed. (Accord, *Nadel* v. *Regents of University of California* (1994) 28 Cal.App.4th 1251, 1269-1270 [34 Cal.Rptr.2d 188] [public figure status where plaintiffs played leadership role in protesting university's plan to build volleyball courts in People's Park by speaking at city council meetings and demonstrations, communicating with news media, and staffing information table at park]; *Lewis* v. *Ueberroth* (1983) 147 Cal.App.3d 442 [195 Cal.Rptr. 150] [public figure status where plaintiffs were officers in organization opposing construction of Olympics sports facilities in Sepulveda Basin]; see also Annot., Who is "Public Figure" for Purposes of Defamation Action (1994) 19 A.L.R.5th 1.)

We have reviewed the declarations and interrogatory responses prepared by the 15 other real parties in interest and submitted as part of the exhibits to determine whether the level of their activities was such that they may also be found to be limited purpose public figures. We conclude that all but three of the fifteen have described sufficient involvement in Middle East and/or South African causes to be considered public figures for purposes of this

litigation. These 12 individuals[8] are each energetic members of numerous organizations dedicated to advancing human rights in the Middle East or South Africa or have otherwise been actively involved in such political efforts.

Jock Taft, however, does not appear to qualify as a limited purpose public figure. So far as the record reveals, the only pertinent activity in which he is engaged is teaching a class on the Palestinians at U.C. Berkeley between 1984 and 1990. Taft states that his classes were disrupted by students allegedly connected with ADL and may have been monitored by Bullock. Merely teaching a university class does not, in our view, constitute the purposeful political activity that warrants classification as a limited purpose public figure. Taft cannot be said to have voluntarily injected himself into the public arena merely because he teaches at a university.

The present record does not satisfactorily show whether the remaining two real parties in interest—Paula Kotakis and Margaret McCormack—are limited purpose public figures. The declaration of Paula Kotakis indicates that for an unspecified period of time she has been active in several unidentified organizations allegedly listed as targets of Roy Bullock's efforts to collect information. The information about McCormack's activities is even more sketchy. In response to an interrogatory inquiring whether protected information about her was disclosed, she responded: "The Palestine Human Rights Campaign is no longer active and its office in Washington, D.C. was burned." The record contains no other information regarding any relevant political activities in which Ms. McCormack may have been engaged. As we shall remand the case, the parties will have an opportunity to augment the record and obtain a ruling from the trial court as to whether Paula Kotakis and Margaret McCormack are limited purpose public figures for purposes of this litigation.

Aside from the question of public figure status, real parties in interest still dispute petitioners' claim of First Amendment immunity under Civil Code 1798.53 by arguing that because their newsgathering techniques were unlawful these activities fell outside the scope of First Amendment protection. We do not believe the alleged unlawfulness of petitioners' information-gathering activities is dispositive of their right to the protection of the First Amendment. Petitioners would be entitled to that protection even if they did violate the statute, *but only if they obtained, used and disseminated the information at issue as journalists*.

---

[8]Victor A. Ajlouny, Yigal Arens, Amal Barkouki-Winter, Manuel Dudum, Carol El-Shaieb, Stephen B. Mashney, Helen Hooper McCloskey, Donald E. McGaffin, Anne Poirer, Agha Saeed, Audrey Park Shabbas and Marianne Torres.

One of the unusual aspects of this case is that, unlike most newsgathering organizations, petitioners' activities are not limited to journalism. ADL is a tax-exempt nonprofit membership organization which describes itself in its pleadings as "a civil rights and human relations organization [which] engages in a broad range of activities designed to combat anti-Semitism, prejudice and bigotry of all kinds. Through its Intergroup Relations Division, ADL works to promote greater understanding of Jews, Judaism and Jewish concerns, as well as intergroup and interreligious understanding. Through its International Affairs Division, ADL seeks to focus attention on the security of Jews around the world and the strategic importance of the State of Israel."

Many of the activities through which ADL seeks to achieve the foregoing purposes are unrelated to conventional journalism, which we conceive to be the gathering and editing of material of current interest for presentation through print or broadcast media, or on the Internet, and available to interested members of the public. For example, ADL privately circulates information, some of it "confidential," only to certain members and persons affiliated with other groups that share its goals.

Unfortunately, the cases arising under Civil Code section 1798.53 do not shed a great deal of light on the breadth of constitutionally protected journalistic activities. *Nicholson* provides some guidance, at least with respect to the gathering (as opposed to the dissemination) of information. That case involved a cause of action for breach of privacy by intrusion based upon newsgathering activities similar to that at issue here, namely, " ' "requesting and persuading" ' " employees of the State Bar to engage in the " ' "unauthorized and unlawful disclosure" ' " of confidential information. (177 Cal.App.3d at p. 520, see fn. 6, *ante*.) The court characterized the allegation as simply stating that the media defendants sought out the newsworthy information which they subsequently published in a newspaper of general circulation. The court held that this type of activity was within the newsgathering activities protected by the First Amendment. (*Nicholson* v. *McClatchy Newspapers, supra*, 177 Cal.App.3d at p. 520.) In reaching this conclusion the court relied upon *Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97 [99 S.Ct. 2667, 61 L.Ed.2d 399], which held that the state could not punish the publication of information obtained through routine newspaper reporting techniques (i.e., asking witnesses, police, and an assistant prosecutor for the youthful offender's name).

■ The *Nicholson* court distinguished routine newsgathering techniques from those employed in *Dietemann* v. *Time, Inc.* (9th Cir. 1971) 449 F.2d 245, where newsmen gained entrance to the plaintiff's home by subterfuge and surreptitiously photographed him and recorded his conversations by

means of a hidden camera and electronic devices. Such activities were not protected by the First Amendment, according to the Ninth Circuit Court of Appeals. Likewise, a photographer's constant surveillance, obtrusive and intruding presence in photographing Jacqueline Kennedy Onassis was held to be outside the news gathering privilege of the First Amendment. (*Galella* v. *Onassis* (2d Cir. 1973) 487 F.2d 986.) Such conduct was contrasted with the routine newsgathering techniques which include "asking persons questions, including those with confidential or restricted information. While the government may desire to keep some proceedings confidential and may impose the duty upon participants to maintain confidentiality, it may not impose criminal or civil liability upon the press for obtaining and publishing newsworthy information through routine reporting techniques." (*Nicholson* v. *McClatchy Newspapers, supra*, 177 Cal.App.3d at pp. 519-520.)

In light of the foregoing, it is apparent that, except with respect to Jock Taft and possibly also Paula Kotakis and Margaret McCormack, the manner in which petitioners allegedly obtained information about real parties constitutes legitimate newsgathering. At least 14 real parties are limited purpose public figures engaged in a newsworthy activity. The fact that ADL apparently never published information about these 14 individuals in the magazines and newspapers they publish and make available to the public is of no great moment, as such information may well have been sought in connection with stories that never materialized.

The problem in this case, however, relates not so much to the manner in which petitioners may have *obtained* the information in question, but the manner in which they may have *used and disseminated* that information. The case law does not address this aspect of the journalistic enterprise since the situations it deals with are invariably those in which the defendant published the information in question in a newspaper or magazine available to the public. Here, the complaint alleges that petitioners disclosed protected nonpublic information to foreign governments and other persons and organizations with no compelling need to know such information, in some cases for a fee. As indicated, petitioner Bullock testified at his deposition testimony that he had sold or given undisclosed information to representatives of the government of South Africa. Suall, ADL's chief "fact-finder," stated at his deposition that he had met in Israel with agents of the Mossad, the Israeli security agency, presumably for the purpose of sharing information. If Bullock's disclosures to South African officials involved nonpublic information about real parties, or if Suall's meetings with Israeli officials also involved disclosures of such information, the protections of the First Amendment would not be available, because private disclosures of such

information to foreign governments could not conceivably constitute a legitimate and constitutionally protected journalistic activity. Nor would the private or "confidential" disclosure of such information to a network consisting of members of ADL and/or affiliated organizations not involved in journalism constitute a protected activity.

To be sure, it has not been shown that any information that may have been gathered by petitioners about real parties in interest was in fact privately disclosed to the governments of Israel or South Africa, or to any other entities or individuals. Nonetheless, real parties have made a showing that ADL was found by the San Francisco Police Department to be in possession of nonpublic information pertaining to certain real parties in interest. The deposition testimony of Bullock and Suall creates a possibility this information was privately disclosed sufficient to justify discovery calculated to lay the matter to rest. Accordingly, we conclude real parties are entitled to discovery specifically tailored to learn whether any information gathered about them by ADL and its agents in violation of Civil Code section 1798.53 was privately disclosed to the government of Israel or South Africa, or to any other agency or individual not a member of or employed by ADL, or to any individual who was then a member or employee of ADL for a nonjournalistic purpose.

## B.

Our conclusion that Jock Taft is not a limited purpose public figure (and that Paula Kotakis and Margaret McCormack also may not be such public figures) requires us to address petitioners' challenge to the trial court's finding that the *Mitchell* criteria had been satisfied. Petitioners assert that only one of the five factors set forth in *Mitchell* has been met—namely, that they are parties to the litigation. According to petitioners, the remaining four factors do not justify disclosure in this case: (1) the importance of the information sought to plaintiffs' case; (2) exhaustion of all alternative sources of obtaining the needed information; (3) the importance of protecting confidentiality in the case at hand; and (4) making a prima facie showing. (37 Cal.3d at pp. 279-282.)

Petitioners dispute that the information sought goes to the heart of real parties' case. Real parties, on the other hand, claim the information at issue is vital to their case. They emphasize that they cannot prevail without identifying exactly what Bullock illegally learned about them from confidential government sources, from which he illegally obtained the information, and to which he and ADL illegally transmitted it. The complaint alleges

violation of privacy under article I, section 1, of the California Constitution and under Civil Code sections 1798.53 and 1798.56[9] as a result of a spying operation conducted by defendants who secretly gathered personal information about real parties in interest from state and federal agencies and disclosed it to individuals and entities with no compelling need to know such information. Petitioners contend that the discovery order goes well beyond the narrow confines of a Civil Code section 1798.53 claim in that it is not narrowly limited to tracking the language of the statute. Discovery, however, is not confined to the actual issues framed by the pleadings. The information sought need not be in a form that would be admissible at trial. There need only be a reasonable prospect that it might lead to admissible evidence. (See Hogan & Weber, 1 Cal. Civil Discovery (1997) § 1.5, p. 9.) In any event, petitioners have acknowledged that their complaints about possible overbreadth of certain requests may still be litigated below. (See fn. 5, *ante*.)

Petitioners vigorously dispute the trial court's finding that real parties have exhausted all reasonable alternative sources of information and do not have any practical way of obtaining such information from sources other than defendants and the San Francisco Police Department. According to petitioners, real parties never made any genuine effort to find alternative sources of the evidence they need. Petitioners argue, for example, that real parties could establish who transmitted the information by seeking discovery from certain governmental agencies.

The sufficiency of real parties' discovery efforts was argued below. Real parties deposed defendants Bullock, Hirschhaut, and Suall, and each refused to identify any information obtained about real parties. They deposed Gerard and Carroll, the only police officers Bullock named as sources, who denied transmitting any of the illegally obtained confidential information regarding real parties Zeltzer and Blankfort found in the possession of ADL. Real parties also deposed Lieutenant Roth, who could not provide any useful information due to a protective order earlier entered by Judge Jones. The court agreed with real parties that they had exhausted alternative sources. The finding that real parties here, unlike those in *Mitchell*, had deposed all known potential alternative sources was justified. (See *Mitchell* v. *Superior Court, supra,* 37 Cal.3d at p. 282.)

Petitioners contend the court ignored the factor of the importance of protecting confidentiality in the case at hand. *Mitchell* directs that ". . .

---

[9]Civil Code section 1798.56 provides: "Any person who willfully requests or obtains any record containing personal information from an agency under false pretenses shall be guilty of a misdemeanor and fined not more than five thousand dollars ($5,000), or imprisoned not more than one year, or both."

when the information relates to matters of great public importance, and when the risk of harm to the source is a substantial one, the court may refuse to require disclosure even though the plaintiff has no other way of obtaining essential information." (37 Cal.3d at p. 283.) The information sought as to Jock Taft does not relate to a public figure or refer to matters of great public importance that would justify nondisclosure under *Nicholson* v. *Superior Court, supra,* 177 Cal.App.3d 509. This case is unlike *Mitchell* where the information at issue related to criminal or unethical conduct on the part of a powerful private organization. (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d at p. 283.) Petitioners do not suggest that the information sought in this case reveals improper conduct on the part of powerful interests, but relates only to political activity on the part of private individuals which, so far as appears, is constitutionally protected. Moreover, petitioners have not persuasively shown that revelation of the information at issue would expose them or their sources to harmful retaliation.

Finally, petitioners object to the court's finding that real parties had satisfied the *Mitchell* requirement that a prima facie showing be made. The showing that needed to be made in *Mitchell* related to the falsity of the allegedly defamatory information. The *Mitchell* court explained that the routine granting of motions seeking compulsory disclosure would emasculate the important principle established in *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, and other cases, unless the substance of the libel charge was first established. A showing that the alleged defamatory statements are false would tend to tip the balance in favor of discovery since there is very little public interest in protecting the source of false accusations of wrongdoing. (37 Cal.3d at p. 283.) Accordingly, *Mitchell* states that ". . . the court *may* require the plaintiff to make a prima facie showing that the alleged defamatory statements are false before requiring disclosure." (*Ibid.,* italics added, fn. omitted.)

The *Mitchell* court's use of the word "may" indicates it viewed the prima facie showing as a discretionary requirement. Requiring a prima facie showing that the alleged defamatory statements are false before ordering disclosure of journalists' sources makes sense in the context of a defamation action. The information needed to show falsity would ordinarily be readily available to the plaintiffs. Thus, requiring such a showing before ordering discovery would not be an onerous burden on such parties.

As, unlike *Mitchell*, this is not a defamation case, the prima facie showing that would be made here relates not to the falsity of petitioners' statements but the likelihood that, in violation of Civil Code section 1798.53, they

intentionally disclosed information, not otherwise public, which they knew or should reasonably have known was obtained from personal information maintained in the records of one or more government agencies. Such a showing is harder for a plaintiff to make in a suit under Civil Code section 1798.53 than the showing of falsity that may be required in a defamation action. The defendant in a defamation action ordinarily cannot prevent the plaintiff from independently establishing the falsity of charges, whereas a defendant in an action under Civil Code section 1798.53 often can prevent the necessary showing from being made simply by resisting disclosure. In the latter situation it may be unfair to permit the defendant to resist discovery if, having exhausted other possible sources of the necessary evidence, that is the only way the plaintiff can make the requisite showing. This possible unfairness was one of the reasons the *Mitchell* court was careful not to say that a trial court must always require the party seeking discovery to make a prima facie showing, stating instead that the trial court "*may*" require such a showing. (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d at p. 283.)[10]

Ignoring the discretionary nature of the prima facie showing requirement, petitioners claim the court imposed such a requirement and found that it had been met only as to two of the seventeen plaintiffs. According to petitioners, the trial court "ruled that 15 of the 17 plaintiffs had not made out a prima facie case of any potential Section 1798.53 violation by ADL." This is not an accurate characterization of the ruling.

In pertinent part, the trial court stated as follows: "Plaintiffs have presented a prima facie case that Defendants Bullock, Hirschhaut and ADL have illegally solicited, obtained and transmitted Civil Code Sec 1798.53 information in the cases of Plaintiffs BLANKFORT and ZELTZER, *and there is a reasonable probability that they have done so in the case of the other named Plaintiffs and members of their class.*" The italicized language, which petitioners simply ignore, amounts to a statement that the remaining 15 plaintiffs had either also made a prima facie showing,[11] or had at least made a showing that was sufficient under the circumstances. Since it allowed discovery to

---

[10]The other reasons suggested in *Mitchell* for not imposing the prima facie showing requirement is that it is closely related to another requirement, that there be no or little public interest in protecting confidentiality. (*Ibid.*)

[11]"Prima facie evidence" is simply that evidence "which will support a ruling in favor of its proponent if no controverting evidence is presented. (*People* v. *Bell* (1989) 49 Cal.3d 502, 554 . . . (conc. opn. of Kaufman, J.); 9 Wigmore on Evidence (Chadbourn rev. 1981) Sufficiency of Evidence, § 2494, pp. 379, 381, 387; Black's Law Dict. (5th ed. 1979) p. 1071.) It may be slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences. (*People* v. *Towler* (1982) 31 Cal.3d 105, 115 . . . .)" (*Evans* v. *Paye* (1995) 32 Cal.App.4th 265, 280-281, fn. 13 [37 Cal.Rptr.2d 915].)

proceed on behalf of all 17 plaintiffs, the trial court must have concluded that all had made the necessary showing that petitioners violated Civil Code section 1798.53. Since imposition of the prima facie showing requirement is not mandatory, the imposition of a somewhat lesser standard—if indeed that is what the trial court had in mind—is certainly permissible.

We agree with the finding of the trial court that real parties in interest have met the criteria set forth in *Mitchell* v. *Superior Court, supra*, 37 Cal.3d 268, as to Jock Taft. It is evident, however, that the discovery order itself is too broad and must be tailored to the disclosure of nonpublic information about Jock Taft contained in ADL files and to whom, if anyone, such information was disclosed.

### C.

The discovery order must be vacated. To the extent that the information sought was within the scope of ADL's function as a journalist, ADL has a First Amendment privilege as to claims by all but one, and possible two others, of the seventeen real parties in interest. As to the real parties who do not have "public figure" status, discovery may be ordered, but it must be tailored to obtaining nonpublic information about them in ADL's files and discovering to whom, if anyone, such information was disclosed.

We have also concluded that, with respect to all real parties, ADL is protected under the First Amendment only to the extent its activities or those of its agents constitute journalism. Thus, allegations that ADL and its agents privately disclosed nonpublic information about real parties in interest to foreign governments or others not acting as ADL journalists are outside the scope of the journalist's privilege. Accordingly, discovery tailored to reveal whether such private disclosures were made should be permitted.[12]

### III. Disposition

The order to show cause is discharged. The petition for writ of prohibition and/or mandate is granted, and respondent court is directed to set aside and

---

[12]Petitioners raised some procedural objections in their reply memorandum that merit mention. They claim that real parties failed to file a verified answer or demurrer as required by rule 56(e), California Rules of Court. Real parties, however, did file a verified answer and return to the order to show cause. Petitioners also object to the exhibits filed by real parties with their verified answer and return on the ground that many of the documents contained therein were not before the trial court at the time of its ruling. Since we are reviewing the trial court's ruling, it is improper to consider documents that were not before the trial court. Accordingly, we have not considered matters not presented below.

vacate its September 19, 1997, order (as amended at the November 6, 1997, status conference). The parties shall bear their own costs on appeal.

Haerle, J., and Lambden, J., concurred.