Filed 10/23/24 (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BLAKE WENTWORTH,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>     Defendant and Respondent. | A168296, A168861<br><br>(Alameda County Super. Ct. No. RG16833088)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on September 30, 2024, be modified as follows:

1. On page 11, the last sentence of the second paragraph that reads, "Tiwon emailed her notes of the meeting to a staff member to be distributed to students." is changed to:

   "Tiwon emailed her notes of the meeting to a student to give to other students."

2. On page 37, the first sentence of the first full paragraph that reads, "Regents do not dispute that they can be held liable for the statements at the April 2016 meeting." is changed to:

1

"For the purposes of this appeal, Regents do not dispute that they can be held liable for the statements at the April 2016 meeting."

3. On page 37, the fourth sentence of the first full paragraph that reads, "But there were other people present at the meeting, and Tiwon emailed her notes of the meeting to be distributed to all students in the department." is changed to:

   "But there were other people present at the meeting, and Tiwon emailed her notes of the meeting to be given to other students in the department."

4. On page 38, the third sentence of the first full paragraph that reads, "Additionally, the notes of the meeting were later circulated to students in the department, and there is no evidence that all these recipients knew about the investigations." is changed to:

   "Additionally, the notes of the meeting were later sent to a student to give to other students in the department, and there is no evidence that all students knew about the investigations."

5. On page 39, the first sentence of the first paragraph that reads, "As with the disclosures at the April 2016 meeting, Regents do not dispute that the leaks of the letter to the San Francisco Chronicle and Daily Californian can be attributed to them." is changed to:

   "As with the disclosures at the April 2016 meeting, for the purposes of this appeal Regents do not dispute that the leaks of the

letter to the San Francisco Chronicle and Daily Californian can be attributed to them."

6. On page 61, the following text shall be added at the end of the last paragraph, after the sentence that reads, "The trial court should also consider the importance or significance of the entire personnel file to Wentworth's overall case, not just the significance of the March 2016 letter."

"Under the unique circumstances of this case, the jury verdict against Wentworth on the personnel file cause of action does not on its own foreclose Wentworth's ability to recover fees under either the traditional or catalyst theories. The verdict was essentially the result of an unforced error by Wentworth and did not address the merits of Wentworth's factual contentions regarding his personnel file. It therefore does not preclude a finding that Wentworth achieved victory in a practical sense or achieved his primary litigation goals when he obtained his complete personnel file only after filing suit and moving to compel production of documents. (See *Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1103 [affirming denial of petition for writ of mandate but holding the petitioners were nonetheless successful and entitled to attorney's fees under Code Civ. Proc., § 1021.5 because they vindicated an important legal principle].)"

There is no change in judgment.

The petition for rehearing is denied.

Date: _____    _____ P. J.

3

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BLAKE WENTWORTH,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>     Defendant and Respondent. | A168296, A168861<br><br>(Alameda County Super. Ct. No. RG16833088) |

Blake Wentworth, formerly a professor at the University of California, Berkeley, appeals from trial court orders granting defendant Regents of the University of California (Regents) summary adjudication of three causes of action under the Fair Employment and Housing Act (Gov. Code, § 12940 et seq.) (FEHA) and Information Practices Act (Civ. Code, § 1798 et seq.) (IPA), denying Wentworth's motion to compel responses to certain discovery requests, and denying Wentworth's request for a retrial of one cause of action for which the jury left the verdict form blank.[1] In a separate consolidated appeal, Wentworth attacks a postjudgment order denying his requests for attorney's fees and costs.

---

[1] Undesignated statutory citations are to the Civil Code.

1

Wentworth fails to demonstrate any prejudicial error as to his claims for failure to engage in the interactive process or provide reasonable accommodations, so we affirm the summary adjudication order as to those claims. We also find no error in the trial court's orders denying Wentworth's motion to compel responses to discovery requests and motion for retrial. The summary adjudication of the invasion of privacy cause of action must be reversed, however, because Wentworth's evidence raises a triable issue of material fact about whether Regents violated the IPA by leaking to the media a letter about student complaints against him and disclosing information about his disability accommodation at a faculty and student meeting. Because we reverse the summary adjudication of the invasion of privacy cause of action, we must also reverse the rulings on the request for attorney's fees and costs. We will remand for further proceedings.

## BACKGROUND

We begin with a general overview of the factual and procedural background of the case. We discuss additional background for some of Wentworth's arguments in the relevant discussion sections, *post*.

### *Hiring, initial complaints, and hospitalization*

Regents hired Wentworth in 2012 as an assistant professor in the department of South and Southeast Asian Studies (department) at the University of California, Berkeley. The essential functions of the job of professor are teaching, research, and service to the department and profession. Assistant

professors like Wentworth receive an appraisal called a mid-career review after seven semesters of work, before being considered for tenure after 11 semesters.

Wentworth had conversations with a fellow professor, Jacob Dalton, about therapy because Wentworth's wife was unhappy. In June 2014, Wentworth wrote to Jeffrey Hadler, who was chair of the department at the time, explaining that he was late in submitting his statement for a review because his marriage was in jeopardy. Wentworth said he was suffering but would pull through.

In November 2014, Hadler told Wentworth that a graduate student, Erin Bennett, had made an informal complaint that Wentworth had made her uncomfortable. Hadler conducted an investigation and believed he resolved the complaint to the satisfaction of the student. During conversations related to the complaint, Wentworth told Hadler that he had been diagnosed with bipolar II disorder.

In February 2015, Wentworth was hospitalized after attempting to commit suicide. Wentworth's mother called Hadler to tell him that Wentworth was in the hospital. The next day, Wentworth's mother told Hadler that Wentworth would be back at work the following week.

The following week, Hadler tried to stop by one of Wentworth's classes but found the classroom dark. However, Hadler may have arrived too early. Wentworth confirmed to Hadler that he had resumed teaching and said he intended to "man up and teach [his] classes, fulfill [his] duties, etc." Hadler

asked to meet because he was not sure how Wentworth's bipolar condition would affect Wentworth's ability to do his job. Hadler noted that Wentworth had been unable to write a letter to nominate a potential graduate student for a university fellowship and had then missed a week of classes without notice. Hadler said he wanted to explore with Wentworth whether there were any accommodations that would allow him to fulfill the essential functions of his job. Hadler suggested that Wentworth review the processes for faculty accommodations. Wentworth agreed to meet but initially resisted any suggestion that his disability would require accommodations, telling Hadler that it was not appropriate to suggest that Wentworth's mental condition required accommodation. Wentworth insisted that his problems were due only to his wife leaving him.

At the meeting, Wentworth asked Hadler about the possibility of teaching through the end of the semester and then taking a research leave. Wentworth told Hadler that teaching was the only thing keeping him from "going over the edge." But Wentworth knew that the university did not offer research leave. Instead, the university offers sabbatical leave for intensive, full-time research after accumulation of a sufficient number of service credits. The university therefore does not offer sabbatical leave as a disability accommodation. Disability accommodations the university offers include the elimination of non-essential functions, paid and unpaid leaves of absence, proportional reductions of duties and compensation, and modifying work schedules. The university usually recommends paid medical

4

leave for faculty who cannot perform an essential function such as teaching. The university offers new parent professors an accommodation called active service modified duty in which the professor is partially or fully relieved from teaching duties. But the university does not offer this as a disability accommodation.

Consistent with these policies, during the February 2015 meeting, Hadler offered Wentworth a medical leave, which would involve relieving him of all duties; stopping his tenure clock, which would require him to continue to teach and perform other duties but push back his deadline for completing a body of research for consideration for tenure purposes; and other accommodations.

In an email after the meeting, Wentworth thanked Hadler for the "deeply humane" conversation and said Hadler could get in touch with his doctor about his prognosis. Hadler responded that Wentworth simply needed to provide medical documentation of the limits of his condition. Hadler also told Wentworth to discuss with his doctors what would be best for him, such as medical leave, stopping his tenure clock, or a request for accommodations. Hadler provided Wentworth a copy of the university's procedures for providing accommodations.

By early April 2015, other students had complained about Wentworth's behavior. Kathleen Gutierrez told Hadler that in February 2015 Wentworth had held her hand, cupped her ear, talked about his personal life, and said he would talk more but was attracted to her and worried about losing his job. When Gutierrez told Wentworth she was not interested in a romantic or

5

sexual relationship with him, Wentworth hinted that he could be helpful with her career.

At a meeting in early April about the student complaints, Wentworth told Hadler he intended to seek stoppage of his tenure clock. In a follow-up email a week later, Hadler told Wentworth that if he intended to request stoppage of his tenure clock without taking a medical leave, the university would consider it if an illness had significantly hampered his ability to advance in research. Hadler added that a doctor's letter, while not always required, would be very helpful. Hadler advised Wentworth to begin the process before mid-July 2015 to stop the clock before his upcoming mid-career review.

Hadler attached to his email a formal letter summarizing their discussions at the meeting about student complaints about Wentworth's conduct. As described in the letter, Wentworth had agreed to sign an agreement not to contact Bennett. One graduate student had alleged that Wentworth made aggressive and vulgar comments to her about her thesis. Students had complained that Wentworth discussed his marital, intimate, or sexual life during an independent study and graduate seminar. All of the graduate students in his spring 2015 seminar had dropped the class, so the class was canceled. Students and faculty had complained that Wentworth had missed meetings of a curriculum committee, disparaged the work of other faculty, and discussed sexual acts and praised the use of illegal drugs in remarks in the graduate student instructors' room and within earshot of undergraduates. Hadler also said in the letter that he

6

had been disappointed that Wentworth had failed to complete a letter nominating a student for a fellowship.

Later in April 2015, Wentworth's doctors wrote notes stating that his partial disability prevented him from satisfying the research component of his duties.  In June 2015, Wentworth submitted these notes with a formal request to stop his tenure clock for two semesters because his bipolar II disorder made productive research impossible for him.  Janet Broughton, the university's Vice Provost for the Faculty, approved Wentworth's request in July 2015, before his mid-career review.

***Investigation, new complaints, and media reports***

In October 2015, the university's Office for the Prevention of Harassment and Discrimination (OPHD) completed a report into the complaints by Bennett and Gutierrez, which also summarized allegations other students had raised.  OPHD found that Wentworth's behavior toward Bennett was unprofessional and exceeded personal boundaries but did not constitute sexual harassment.  OPHD further found that Wentworth's behavior with Gutierrez violated the university's policy against sexual harassment and forwarded the issue to Broughton.  OPHD provided its report to Bennett and Gutierrez.  Bennett was upset about the lack of a finding on her complaint and told Hadler and others she had dropped out of her program and wanted to go to the press.

Jacob Dalton had taken over from Hadler as chair of the department.  Hadler asked Dalton whether, in light of the OPHD finding, the department should be informed and hold a vote to

7

show the graduate students that the department was taking the issue seriously. Broughton advised Dalton and Hadler that while they as the former and current department chairs were privy to confidential personnel matters like the report's existence and findings, the OPHD report was still confidential as to other faculty members. She also informed them that sanctions against faculty members proceeded by first appointing faculty investigators and then, depending on the investigators' conclusions, referring the matter to the Academic Senate. Hadler asked Dalton privately whether it would take a public scandal and disgrace before the university would really act. Broughton appointed two faculty members to investigate Wentworth's alleged misconduct and determine whether it violated the faculty code of conduct.

In February 2016, an undergraduate student made new allegations of sexual harassment by Wentworth. These allegations were forwarded to the same faculty investigators as the prior ones.

Also in early 2016, Bennett discussed her experience with Melissa Batchelor Warnke, a freelance reporter and graduate student at the university's journalism school. Bennett arranged for Warnke to meet Gutierrez.

In March 2016, when department faculty knew that an article Warnke had written was about to be published, faculty members wrote a letter to Dalton as the department chair. Without mentioning Wentworth by name, the letter stated that seven students had made allegations against a department

8

faculty member and that six of the students' complaints "were either dismissed or shut down by OPHD."  The letter's signatories believed that the complaints deserved a fuller hearing.  They also noted that the one complaint that had gone forward had been filed by the student in April 2015 and the student had not reported to an ad-hoc committee (apparently referring to faculty investigators) until March 2016.  The letter's signatories asked Dalton, as the chair, to take immediate action to enforce the faculty code of conduct and ensure that students could learn in an environment free of sexual harassment and sexual violence.

During the litigation of this case, Regents initially produced a copy of this letter signed by department faculty members Hadler, Penny Edwards, Munis Faruqui, Sylvia Tiwon, Robert Goldman, and Alexander von Rospatt, but deposition testimony later showed this letter was not the original.  Regents produced a different version of the letter, substantively identical, that was signed only by Hadler, Edwards, Faruqui, and Tiwon.  Dalton personally handed Broughton the original hard copy of this letter, who placed it in a locked cabinet in her office with confidential information about Wentworth.  Broughton later testified that she did not view the letter itself as confidential.

Three days later, Broughton expected that the San Francisco Chronicle would be publishing Warnke's article about Wentworth within days.  Broughton and department faculty wanted to tell Wentworth about the article and check up on him because of his mental disability.  They also expected that

9

Wentworth would not want to come to campus after the article. At Broughton's request, von Rospatt went uninvited to Wentworth's home to encourage him to go on leave. Wentworth wanted to keep teaching. A few days later, Broughton told von Rospatt that if Wentworth wanted to teach, von Rospatt would have to sit in the classroom as a monitor or observer. Von Rospatt communicated this to Wentworth. Wentworth said he would think about it. He stopped teaching his classes while he considered the condition of a monitor. Broughton and Dalton therefore removed Wentworth from teaching.

While these discussions were taking place, at the end of March 2016, the San Francisco Chronicle published Warnke's article. (Warnke, *UC harassment inquiry shows system's shortcomings, faculty say*, S.F. Chronicle (Mar. 28, 2016).) Warnke wrote the article with the assistance of professors in the university's journalism school. The article opened with a description of the March 2016 letter from the department professors to Dalton that had been delivered to Broughton. The article quoted Hadler as saying, "I'm tired of being told to keep my mouth shut and let the wheels of justice turn, because they're turning pretty slowly." (*Ibid.*) The article then said the letter was about Wentworth. The article also quoted Tiwon, another of the letter's signatories. The article named Bennett, Gutierrez, and three other students as complainants. After the publication of the article, Warnke said in an interview that she had reviewed "a ton, a ton, a ton of emails, notes from meetings, agendas, [and] the case files themselves" when researching the article.

10

Broughton acknowledged in a meeting with faculty a few days after the publication of the article that the disclosure of the March 2016 letter violated confidentiality.  A day later, von Rospatt, one of the professors who signed the letter, asked Edwards, another signer of the letter, to send a copy of the letter to a reporter at the Daily Californian.  The Daily Californian then published its own article, describing the letter and noting that Dalton had passed it on to Broughton.  (Dell'Amico, *Faculty members condemn slow investigation of sexual harassment investigations*, The Daily Californian (Mar. 31, 2016).)  This article again named Wentworth as the professor referred to in the faculty letter.  The article quoted Tiwon and an attorney representing Bennett and Gutierrez.

Dalton called a department meeting of faculty and students in April 2016, about two weeks after the articles came out.  According to contemporaneous notes of the meeting, Dalton said that 10 students had complained to OPHD and that he had turned over his journal, but that Broughton had told him everything was confidential.  When one person remarked that it had been obvious that Wentworth was "barely hanging on" and "couldn't deal with the stresses in his personal life," Hadler said that he had offered Wentworth paid medical leave and Wentworth had refused it.  Hadler noted that he had not been in a position to force Wentworth to take it or even recommend it.  Later in the meeting, Dalton said that Wentworth had been offered leave but refused and then did not show up for his classes.

11

Tiwon emailed her notes of the meeting to a staff member to be distributed to students.

***Non-reappointment and dismissal***

Also in April 2016, Wentworth's counsel sent a letter to Broughton notifying her that Wentworth would file a FEHA disability harassment action and asking for copies of his personnel and other employment records. Regents did not produce Wentworth's personnel file until February 2017, after Wentworth had filed his complaint.

In late May 2016, the faculty investigators issued a report describing their findings. The report mentioned that Wentworth had missed classes and failed to write the fellowship nomination letter. The bulk of the report, however, focused on the sexual harassment and other complaints about Wentworth's behavior. The investigators concluded that the allegations against Wentworth were credible and, if true, would violate the university's policy on sexual harassment and the faculty code of conduct. The investigators recommended that Wentworth be dismissed based on the totality of his misconduct in a variety of settings over a long period of time. The next month, Wentworth was notified that a formal complaint would be filed with the Academic Senate's Committee on Privilege and Tenure. At the same time, OPHD began investigating a new complaint against Wentworth by a different student, Nicole Hemenway.[2]

---

[2] Wentworth later sued Bennett, Gutierrez, and Hemenway. (See *Wentworth v. Hemenway* (June 5, 2019, A154511) [nonpub. opn.]; *Wentworth v. Bennett et al.* (July 23, 2018, A151689) [nonpub. opn.].)

In October 2016, Dalton, as chair of the department, recommended to the relevant dean that the university not reappoint Wentworth at the end of his contract. Dalton acknowledged that Wentworth had glowing comments on his student evaluation forms. But he recommended that Wentworth not be reappointed based on information in Hadler's notes about Wentworth's alleged conduct and the various students' complaints against him. Dalton also noted that Wentworth failed to fulfill his teaching responsibilities throughout the spring of 2015, citing specifically the instance after Wentworth's hospitalization when Hadler had found no one in Wentworth's classroom but may have arrived too early.

The Academic Senate committee held a hearing in December 2016 on the faculty investigators' dismissal recommendation. One of the issues on the agenda for the hearing was to determine whether Wentworth had violated the faculty code of conduct by failing to teach class as scheduled and failing to complete the fellowship nomination letter.

In January 2017, the dean concurred in Dalton's recommendation that Wentworth not be reappointed and passed it on to the chancellor for the final decision. The dean noted that Wentworth had no research activity to assess and a poor record of service on committees. The dean also cited the complaints of "unfulfilled teaching responsibilities," inappropriate discussions, and unacceptable behavior towards students. The Chancellor denied reappointment, with the decision to take effect in June

13

2018, pursuant to the university's policy of giving 12 months' notice of non-reappointments.

In April 2017, the Academic Senate issued a report on the disciplinary case against Wentworth. The Academic Senate committee concluded that Wentworth violated the sexual harassment policy and failed to strive to be objective in his judgment of colleagues when advising students. The committee found these violations warranted dismissal. The committee found that Wentworth had failed to meet classes as scheduled and had failed to complete the fellowship nomination letter but that those lapses were not numerous or serious enough to violate the faculty code of conduct. The Chancellor terminated Wentworth in May 2017.

### *Litigation*

Wentworth filed this action against Regents in September 2016. He amended his complaint twice after Regents denied him reappointment and terminated him. As amended, the complaint stated six causes of action under FEHA: (1) disability harassment; (2) disability discrimination; (3) retaliation; (4) failure to engage in the interactive process; (5) failure to provide reasonable accommodation; and (6) failure to prevent discrimination, harassment, and retaliation. Wentworth also alleged causes of action for (7) wrongful discharge under Labor Code section 1102.5, which prohibits various forms of retaliation against employees; (8) failing to allow him to inspect and copy his personnel file, in violation of section 1798.34, Government Code

14

section 31011, and Labor Code section 1198.5; and (9) invasion of privacy in violation of the California Constitution and the IPA.

The trial court denied Wentworth's motion to compel Regents to respond to discovery requests seeking communications with Warnke and the journalism school relating to the publication of Warnke's article in the San Francisco Chronicle.

The trial court granted summary adjudication of Wentworth's causes of action for failure to engage in the interactive process, failure to provide reasonable accommodations, and invasion of privacy. Wentworth's remaining causes of action went to trial before a jury. The trial was delayed and took place remotely due to the pandemic. The jury returned a special verdict in favor of Regents on all of Wentworth's causes of action except for the cause of action for failure to disclose his personnel file. The verdict form told the jury not to answer the questions relating to that cause of action, and they did not. The trial court denied Wentworth's motion for a directed verdict or retrial of the personnel file cause of action. The trial court entered judgment on the special verdict and summary adjudication order. Wentworth appealed.

Wentworth moved for an award of attorney's fees and costs on the personnel file cause of action. The trial court denied the request for fees and costs. Wentworth appealed that order separately. We consolidated the appeals on our own motion.

## DISCUSSION

Wentworth challenges trial court orders from different stages of the proceedings, ranging from discovery to summary

15

adjudication to post-trial. We will address each argument in turn. However, we begin with one overarching flaw in Wentworth's briefing that undermines Wentworth's arguments.

## I.    Inadequate record citations

California Rules of Court, rule 8.204(a)(1)(C) states that each appellate brief must "[s]upport *any* reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Italics added.) It is an elementary principle of appellate practice that this requirement applies to every factual reference in a brief. " 'Any statement in a brief concerning matters in the appellate record — whether factual or procedural and *no matter where in the brief the reference to the record occurs* — must be supported by a citation to the record.' " (*Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 970, italics added and omitted.) The Courts of Appeal "have the discretion to disregard contentions unsupported by proper page cites to the record" (*ibid.*) and will conclude that parties forfeit arguments by failing to support statements in the argument section of a brief with record citations. As *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 (*WFG National Title*) stated, "Rather than scour the record unguided, we may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record." That court found an appellant forfeited several challenges to a summary judgment ruling because the appellant failed to support them with record citations. (*Id.* at p. 895.)

Summary judgment cases like *WFG National Title* and this one demonstrate why the rule exists. The record in these consolidated cases is considerable, stretching to 17 volumes and over 5000 pages of appellant's appendix. Wentworth's arguments largely turn on the specific evidence and arguments before the trial court. While Wentworth provides record citations for the factual background section of his brief, seldom does he provide record citations in the argument sections of his briefs. Thus, to find the record evidence supporting the factual assertions Wentworth makes in his arguments, we must comb through Wentworth's briefs to try to find portions of the factual background that correspond to the argument's factual statements and then check the supporting record citations. This violates the California Rules of Court and imposes a significant burden on the court's resources. Moreover, Regents had to do the same when drafting its respondent's briefs, at the risk of potentially missing connections between the factual background and argument sections of Wentworth's brief.[3] This is improper.

We could choose to find Wentworth forfeited his arguments by failing to comply with the basic requirement of record citations. (*WFG National Title, supra*, 51 Cal.App.5th at

---

[3] Regents' briefs, too, fail to provide direct citations to the record in some instances. But Regents, at least, provide cross-references to the relevant portion of the factual background of their brief where the record citations can be found, which reduces the burden slightly. In any event, Wentworth as the appellant has the burden of affirmatively proving error, so the lack of citations in Wentworth's brief supports affirmance. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.)

17

pp. 894–895.) Nonetheless, we have attempted to determine and address, as best we can, the factual support for Wentworth's positions. However, given his deficient briefing, Wentworth has forfeited the right to complain in a petition for rehearing if this opinion fails to address any particular evidence bearing on his arguments.

## II. Summary adjudication

" ' "A defendant making the motion for summary adjudication has the initial burden of showing that the cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. [Citations.] If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied. However, if the moving papers establish a prima facie showing that justifies a judgment in the defendant's favor, the burden then shifts to the plaintiff to make a prima facie showing of the existence of a triable material factual issue." [Citation.] "A prima facie showing is one that is sufficient to support the position of the party in question." ' " (*Wilson v. County of San Joaquin* (2019) 38 Cal.App.5th 1, 9.) "There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845.)

On appeal, " '[w]e review the record and the determination of the trial court de novo.' " (*Wilson v. County of San Joaquin,*

18

*supra*, 38 Cal.App.5th at p. 9.)  We likewise review the interpretation of statutes de novo.  (*Ibid.*)  The trial court's reasons for its ruling "are not binding on us because we review its ruling, not its rationale."  (*Ram's Gate Winery, LLC v. Roche* (2015) 235 Cal.App.4th 1071, 1079.)  We "must affirm on any ground supported by the record."  (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140.)

## A. *Reasonable accommodation and interactive process*

### 1. Legal background

"Under [Government Code] section 12940, it is an unlawful employment practice 'to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee' unless the employer demonstrates doing so would impose an undue hardship.  ([Gov. Code,] § 12940, subd. (m).)" (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1192.) Looking to analogous federal law, California courts have construed "reasonable accommodation to mean 'a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired.' " (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1010.)  "The examples of reasonable accommodations in the relevant statutes and regulations include reallocating nonessential functions or modifying how or when an employee performs an essential function, but not eliminating essential functions altogether.  FEHA does not obligate the employer to accommodate the employee by excusing him or her from the performance of essential functions."  (*Nealy v. City of Santa*

19

*Monica* (2015) 234 Cal.App.4th 359, 375, superseded by statute on other grounds as stated in *Ruiz v. ParadigmWorks Group, Inc.* (9th Cir. 2019) 787 Fed.Appx. 384, 386.)

"An employer or other covered entity is required to consider any and all reasonable accommodations of which it is aware or that are brought to its attention by the applicant or employee, except ones that create an undue hardship.  The employer or other covered entity shall consider the preference of the applicant or employee to be accommodated, but has the right to select and implement an accommodation that is effective for both the employee and the employer or other covered entity."  (Cal. Code Regs., tit. 2, § 11068, subd. (e); accord, *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 228 ["The employer is not obligated to choose the best accommodation or the accommodation the employee seeks"].)  When "the disability or the need for accommodation is not obvious" and the employer requests it, an employee must provide reasonable medical documentation to confirm the employee's relevant limitations.  (Cal. Code Regs., tit. 2, § 11069, subd. (d)(1).)

"The FEHA imposes an additional duty on the employer 'to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations . . . .' ([Gov. Code,] § 12940, subd. (n).)"  (*Wilson v. County of Orange, supra,* 169 Cal.App.4th at p. 1193.)  "The failure to accommodate and the failure to engage in the interactive process are separate, independent claims involving different proof of facts."  (*A.M. v. Albertsons, LLC* (2009)

20

178 Cal.App.4th 455, 463–464.)  " '[T]he interactive process of fashioning an appropriate accommodation lies primarily with the employee.' [Citation.]  An employee cannot demand clairvoyance of his employer.  [Citation.]  ' "[T]he employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it. . . ." '  [Citation.]  'It is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the earliest opportunity with a concise list of restrictions which must be met to accommodate the employee.' " (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 443.)

### 2. Analysis

Regents' summary adjudication motion was aimed at the issues of whether Regents failed to engage in the interactive process and reasonably accommodate Wentworth's disabilities. An employer " 'cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good

21

faith.'" (*King v. United Parcel Service, Inc.*, *supra*, 152 Cal.App.4th at pp. 442–443.)

To support its motion, Regents pointed to evidence that after Wentworth's hospitalization for a suicide attempt, Hadler emailed and met with Wentworth and offered different accommodations, including stopping his tenure clock. Wentworth did not tell Hadler he was unable to teach; to the contrary, he asked to continue to teach and said that teaching was the only thing keeping him from "going over the edge." Similarly, after Hadler asked Wentworth to provide medical documentation of the functional limitations of his condition, Wentworth and his doctors only said he was unable to perform research, not unable to teach. The university approved Wentworth's request to stop his tenure clock in July 2015, which gave him more time to perform the research needed for his mid-career review.

This evidence is sufficient to establish that Regents engaged in the interactive process in good faith and offered an accommodation that would reasonably meet Wentworth's needs as he identified them. Wentworth offers four reasons why there was a dispute of fact over the reasonableness of Regents' accommodations and engagement in the interactive process, but none has merit.

### a. *Excusing absences and failure to complete nomination letter*

First, Wentworth contends Regents should have accommodated him by excusing his absences and failure to complete a nomination letter related to his hospitalization, which

were part of his disability.  He argues Regents instead punished him for that conduct when Hadler disciplined him, Regents denied him reappointment, and university investigators and the Academic Senate recommended termination.  Wentworth views this discipline as chilling the interactive process.  There is some evidence in the record, albeit slim, to support this argument.  But as Wentworth himself notes, this aspect of his failure to accommodate claim is a reformulation of another claim in his complaint that Regents discriminated against him by subjecting him to the same adverse employment actions because of his disability.  (*Humphrey v. Memorial Hospitals Ass'n* (9th Cir. 2001) 239 F.3d 1128, 1139 [failure to accommodate and unlawful termination claims are often, "from a practical standpoint, the same" because "the consequence of the failure to accommodate is . . . frequently an unlawful termination"]; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 ["Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes"].)  The jury rejected the discrimination claim, concluding that Wentworth's disability was not a substantial motivating reason for the university's adverse employment actions.

Wentworth tries to avoid the significance of this finding by arguing that appellate review of a summary judgment or adjudication is limited to the evidence submitted with the motion papers and does not consider evidence from trial or other proceedings in the case.  (*Lewis v. City of Benicia* (2014)

23

224 Cal.App.4th 1519, 1524, fn.4.)  But to obtain a reversal of the summary judgment order, Wentworth must demonstrate prejudice, meaning a reasonable probability of a more favorable outcome.  (*Californians for Population Stabilization v. Hewlett-Packard Co.* (1997) 58 Cal.App.4th 273, 294 (*Californians for Population Stabilization*), disapproved on other grounds by *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163; *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833 ["When the trial court commits error in ruling on matters relating to pleadings, procedures, or other preliminary matters, reversal can generally be predicated thereon only if the appellant can show resulting prejudice, and the probability of a more favorable outcome, *at trial*"].)  Wentworth cannot prove prejudice from any error in summarily adjudicating Wentworth's claim on theories that overlap with the theories rejected in the jury's verdict, which Wentworth does not challenge.  (*Californians for Population Stabilization*, at p. 294 [where one defendant's liability was derivative of second defendant's and trial court correctly ruled in trial that second defendant was not liable, any errors in grant of summary judgment to first defendant could not be prejudicial]; see *Waller v. TJD, Inc.*, at p. 833 [denial of defendant's summary judgment motion not prejudicial when jury later returns verdict against defendant]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 102-103, 105–109 [error in directing verdict on nuisance theory was not shown to be prejudicial where jury found against plaintiff on overlapping negligence theory].)

24

There is some scant authority rejecting the application of harmless error at the summary judgment stage, but it is not persuasive. *Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 947 remarked, "It has been said that the erroneous granting of a summary judgment motion 'lies outside the curative provisions' of the harmless error provision of the California Constitution because such an error denies a party of its right to a jury trial." However, the authorities cited in *Hawkins* date to an earlier era of summary judgment jurisprudence when summary judgment was viewed with disfavor. (*Ibid.* [citing cases decided in 1962, 1975, and 1985]; *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542 [before 1992, summary judgment "was more disfavored than it is today"; it "is now seen as 'a particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case"].) Additionally, relying on a jury verdict to establish a lack of prejudice from the granting of a summary adjudication motion on an overlapping theory does not deny a plaintiff the right to a jury trial.

*Borman v. Brown* (2021) 59 Cal.App.5th 1048, 1069–1070 rejected an argument that a jury's verdict on one claim made nonprejudicial an erroneous grant of summary adjudication of another claim based on overlapping evidence, but the court was evidently unaware of *Californians for Population Stabilization* or *Waller v. TJD, Inc.* (*Borman*, at p. 1070 ["We are aware of no authority, and defendants cite none, that supports the proposition that a party must demonstrate that it is reasonably probable that the party would obtain a positive result at *trial*, in

25

order to obtain reversal of a *summary adjudication* order where the party has presented evidence demonstrating the existence of a triable issue of fact"].)  Additionally, in *Borman* there was at most an overlap in evidence "to some degree" (*ibid*.) between the two claims.  (*Id*. at p. 1050, fn. 3, 1053–1054.)  The overlap of Wentworth's theories here is more significant and touches both the evidence and the legal concepts of whether the adverse employment actions against Wentworth constitute a failure to accommodate or to engage in the interactive process.  *Borman* is distinguishable.

### b. *Research leave and active service modified duty*

Second, Wentworth argues there is evidence that Regents should have engaged further with the interactive process and offered to accommodate his disability by offering him research leave or active service modified duty, so that he would not need to teach and could focus on research and writing.  Wentworth also asserts Regents improperly delayed in offering an accommodation between February and July 2015, until he made a formal, written request.

The record does not support these arguments.  On the timing question, after his hospitalization in the first week of February 2015, Wentworth initially resisted any suggestion that his disability would require accommodations, telling Hadler that he would "man up and teach his classes" and that it was "inappropriate" of Hadler to suggest that Wentworth's mental condition required accommodation.  Wentworth insisted that his problems were due only to his wife leaving him.  After Hadler

26

gave Wentworth options for accommodations and told him to provide medical documentation of his limitations, Wentworth did nothing until April, when he suggested he intended to stop his tenure clock. Hadler looked into the issue, suggested again that a doctor's note would be helpful, and urged Wentworth to submit a request quickly. Wentworth's doctors wrote notes within a week of this meeting, but Wentworth did not submit them with a formal request until June 2015. The only reasonable interpretation of this evidence is that any delay was of Wentworth's making.

As for research leave and active service modified duty, Wentworth and his doctors told Regents only that Wentworth's disability impaired his ability to conduct research. It would make little sense for Regents to place Wentworth on research leave or active service modified duty to focus on the one function that he could not perform, given that Wentworth asked to continue to teach and told Hadler that teaching was the only thing keeping him from "going over the edge." Moreover, even if Regents could have accommodated Wentworth's inability to conduct research while teaching by relieving him of teaching duties and giving him time to focus exclusively on research, Regents was not obligated to offer research leave or active service modified duty if stopping his tenure clock was also a reasonable accommodation. (*Hanson v. Lucky Stores, Inc.*, *supra*, 74 Cal.App.4th at p. 228 [" '[A]n employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided' "].)

### c. *Stopping tenure clock*

Third, Wentworth disputes the trial court's conclusion that undisputed evidence showed that stoppage of his tenure clock was a reasonable accommodation. He contends that delaying his tenure review for a year maintained his daily tasks and burdens and did not accommodate the impairment to his ability to research and write. But stopping a tenure clock eases a professor's burden of working on research by giving more time to amass a body of research before the mid-career review. It was therefore directly aimed at accommodating Wentworth's inability to research and write effectively on a daily basis. Wentworth insists that delaying his tenure review for a year did not allow him to reach tenure at the same pace as non-disabled peers. This amounts to an argument that Regents should have waived the obligation to conduct the normal amount of research and allowed Wentworth to progress towards tenure at the same pace as his peers despite the lack of comparable quantities of research. But research is one of the essential functions of a professor, along with teaching and service to the school community. "[E]limination of an essential function is not a reasonable accommodation." (*Nealy v. City of Santa Monica*, *supra*, 234 Cal.App.4th at p. 375.)

Wentworth also complains that Regents denied him reappointment in 2017 based on his insufficient research and publishing production during the time period in which his tenure clock was stopped. This amounts to an argument that he was not reappointed because of his inability to perform research due to

28

his disability. The jury's finding that Wentworth's disability was not a motivating reason for the adverse employment actions against him again forecloses this kind of argument. (*Californians for Population Stabilization, supra,* 58 Cal.App.4th at p. 294.) Besides, the stoppage of Wentworth's tenure clock was not an exemption from the obligation to produce research, but rather an extension of the period in which to produce research. Wentworth's reappointment review was delayed by a year, consistent with the clock stoppage, so it was proper to include the stoppage time when assessing Wentworth's body of research at that review. If Wentworth was unable to produce sufficient research during the expanded time period, it was his obligation to notify Regents. (*Brown v. Los Angeles Unified School Dist.* (2021) 60 Cal.App.5th 1092, 1108 ["If a reasonable accommodation does not work, the employee must notify the employer, who has a duty to provide further accommodation"].) As the trial court noted, Wentworth never said that tenure clock stoppage was inadequate or requested a further accommodation.

### d. Excused absence in spring 2016

Fourth and finally, Wentworth argues Regents should have offered him a brief, excused absence in spring 2016 when the San Francisco Chronicle article was published. Instead, Regents banned him from teaching after he refused to choose between taking leave for the rest of the term and accepting the humiliation of having his classes monitored by an observer. While Regents offered paid leave in spring 2016 because of concerns about Wentworth's emotional disability, Wentworth

does not cite any evidence that he actually needed leave from teaching at all in order to perform his job. To the contrary, Wentworth insisted on continuing to teach. Even if Wentworth is correct that he was not obligated to request a specific accommodation (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 954), he still had to give Regents some reason to think an accommodation was necessary. (*Lin v. Kaiser Foundation Hospitals* (2023) 88 Cal.App.5th 712, 728 ["an employer need not read an employee's mind or provide accommodations of which it is unaware"].) Wentworth cites no evidence that he did so, so Regents had no reason to offer him a brief leave instead.

## B. *Invasion of privacy*

### 1. Additional background

In his ninth cause of action for invasion of privacy, Wentworth alleged that Regents violated their duty to protect the privacy of his employment records under two separate legal authorities, the IPA and the California Constitution. Factually, the cause of action rested on the leaks of the March 2016 letter to the San Francisco Chronicle and Daily Californian and Dalton's and Hadler's verbal disclosures at the April 2016 department meeting that Wentworth refused an offer of paid medical leave and OPHD had investigated 10 student complaints against Wentworth.

When Regents moved for summary judgment of Wentworth's invasion of privacy cause of action, it argued first that his claim based on the IPA was barred by the statute of

30

limitations. It separately argued that his constitutional claim failed because he failed to identify any confidential or sensitive information giving rise to a protected privacy interest. Regents' motion therefore sought to dispose of the entire cause of action by using different tactics to defeat the two different legal theories supporting it. Wentworth raised this point in his opposition, noting that Regents had only contested IPA liability on statute of limitations grounds and asserting he therefore had no obligation to submit evidence of liability or damages. In its reply, Regents expanded both arguments to try to have each address the entire cause of action, arguing that the statute of limitations barred both theories and that Wentworth had failed to identify the disclosure of any constitutionally protected confidential information or any personal information under the IPA.

The trial court rejected Regents' argument that the statute of limitations defense barred the cause of action. But it nonetheless granted summary adjudication of the cause of action "because Plaintiff fails to present evidence demonstrating that the Regents disclosed any information about him protected by his constitutional right to privacy." The trial court explained that the March 2016 letter leaked to the media did not contain confidential information about Wentworth and the media's later determination that the letter pertained to him did not retroactively transform the letter into a disclosure of confidential information.

## 2. Analysis

The Legislature designed the IPA "to prevent misuse of the increasing amount of information about citizens which government agencies amass in the course of their multifarious activities, the disclosure of which could be embarrassing or otherwise prejudicial to individuals or organizations." (*Anti-Defamation League of B'nai B'rith v. Superior Court* (1998) 67 Cal.App.4th 1072, 1079 (*Anti-Defamation League*).) Section 1798.24 prohibits state agencies from disclosing "any personal information in a manner that would link the information disclosed to the individual to whom it pertains" except in certain defined circumstances.[4] "Personal information" is defined in section 1798.3, subdivision (a) as "any information that is maintained by an agency that identifies or describes an individual, including, but not limited to, the individual's name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history." Section 1798.45, subdivision (c) provides a civil cause of action against any agency that fails to comply with the anti-disclosure provision "in such a way as to have an adverse effect on an individual." We independently review the

---

[4] Other provisions of the IPA require agencies to allow anyone to inspect personal information about him or her in the agency's records and give individuals a right of action if an agency refuses to comply with a request for such inspection. (§§ 1798.34, subd. (a), 1798.45, subd. (a).) We discuss those aspects of the IPA separately, *post*, in connection with Wentworth's request for attorney's fees.

interpretation and application of this statute to undisputed facts. (*Lorig v. Medical Board* (2000) 78 Cal.App.4th 462, 468–469.)

Wentworth argues the trial court's order requires reversal because Regents' motion raised only a statute of limitations defense to the IPA theory supporting the invasion of privacy cause of action. Once the trial court rejected that defense, he contends it should have denied the motion rather than reaching to grant it on substantive grounds. He also argues that there are triable issues of fact that require a trial on the invasion of privacy cause of action on both the IPA and constitutional theories.

The trial court's order does not support its grant of summary adjudication of the entire invasion of privacy cause of action. Factually, the trial court addressed only the disclosure of the March 2016 letter to the Daily Californian and San Francisco Chronicle, without mentioning Wentworth's allegations that disclosures at the April 2016 meeting also invaded his privacy. Legally, even if the trial court implicitly determined that Regents had not waived its challenge to the substance of Wentworth's IPA theory by waiting to raise it until its reply in support of its summary adjudication motion, nothing in the trial court's order addresses the IPA. The trial court adopted Regents' argument that Wentworth failed to identify any disclosure of constitutionally protected confidential information. But it never explained why IPA protection would be limited to confidential information or analyzed whether the information disclosed constituted "personal information" under the IPA.

Wentworth's IPA and constitutional theories are distinct, and the trial court's ruling on the merits of the constitutional theory does not transfer to the IPA theory. The constitutional right to privacy is violated only by the disclosure of private information, so the disclosure of information that is already public does not support a claim. (*Moreno v. Hanford Sentinel, Inc.* (2009) 172 Cal.App.4th 1125, 1129–1130.) Additionally, because the California Constitution protects against conduct constituting " 'a serious invasion of privacy' " (*Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 43), trivial violations can be disregarded. The IPA, however, prohibited Regents from "disclos[ing]" in a way that would link to Wentworth (§ 1798.24) any information that "identifie[d] or describe[d]" him, including but not limited to his "name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history" (§ 1798.3, subd. (a)). The Regents' briefing below and the trial court's order contain no authority requiring that personal information be confidential or private to be protected from disclosure under the IPA. Nor do the briefing and order identify any authority allowing the trial court to weigh the gravity of disclosures under the IPA and dismiss actions if the disclosures were not significant.

On appeal, Regents try to address these deficiencies by arguing that the letter and meeting disclosures did not contain Wentworth's "personal information" as the IPA defines the term. Regents also note that an individual has a private right of action

34

for disclosures of personal information only when the disclosures have "an adverse effect on an individual." (§ 1798.45, subd. (c).) Regents then briefly assert that the alleged disclosures were too slight to have had an adverse effect on Wentworth. Regents also point out that we must review the trial court's ruling not its rationale and must affirm on any ground supported by the record (*Ram's Gate Winery, LLC v. Roche*, *supra*, 235 Cal.App.4th at p. 1079; *Jimenez v. County of Los Angeles*, *supra*, 130 Cal.App.4th at p. 140) so long as Wentworth had an opportunity to present evidence and argue the existence of a fact dispute. Regents contend that they addressed the substance of the privacy claim in the trial court, and Wentworth responded on the merits of the IPA theory and also briefed the IPA claim on appeal.

Regents could be correct that the statutory requirement of an adverse effect makes the confidentiality of information relevant to the viability of an IPA disclosure claim. If the audience for a disclosure already knows information about an individual, disclosure of it by an agency might not have an adverse effect on the individual. However, this assumption may not always hold true. Official disclosure of a fact already known to some people, such as the existence of the OPHD investigations into Wentworth, still adds some additional force to that information and could cause some incremental harm. The question of adverse effect is ultimately a factual one.

Regents did not frame its argument in terms of adverse effect in the trial court. Wentworth therefore had no reason or duty to marshal evidence regarding the adverse effects of the

35

disclosure or liability under the IPA at all. Wentworth explicitly raised this point in his opposition to Regents' summary adjudication motion in the trial court. Regents' assertion that Wentworth has briefed the issue on appeal is no answer, because appeals are normally limited to the evidence in the record and Wentworth cannot now augment the record with any extra evidence. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) In short, because Regents initially relied only on the statute of limitations as to Wentworth's IPA theory, we agree with Wentworth that it would be unfair to affirm summary adjudication of the IPA claim based on Regents' alternative arguments on appeal regarding adverse effect.

Even if we were to consider Regents' arguments about whether the disclosures contained personal information or had no adverse effect because they were not confidential, those arguments fail. Triable issues of material fact regarding the IPA theory preclude summary adjudication.

A jury could reasonably conclude that Hadler disclosed Wentworth's personal information at the April 2016 meeting and that the disclosure had an adverse effect. "Personal information" includes medical history. (§ 1798.3, subd. (a).) Hadler's mention of his offer to Wentworth of paid medical leave indirectly revealed that Wentworth had some sort of medical condition and that the condition was severe enough to warrant a leave of absence as an accommodation. A reasonable jury could infer that disclosure of such information would be embarrassing to Wentworth. In addition, "personal information" includes employment history,

36

and disciplinary history is a part of employment history. (*Ibid.*; *Hurley v. Department of Parks & Recreation* (2018) 20 Cal.App.5th 634, 644 [jury reasonably concluded that supervisor's file that contained documents regarding disciplinary or corrective actions taken with respect to employees contained personal information under IPA].) Dalton's mention of the 10 complaints to OPHD was therefore also a disclosure of Wentworth's personal employment information. Broughton's instruction to Dalton and Hadler only a few months earlier that the existence of the OPHD investigations into Wentworth was a confidential personnel matter also supports Wentworth's position that the existence of the OPHD investigations was personal employment information.

Regents do not dispute that they can be held liable for the statements at the April 2016 meeting. Instead, regarding the offer of paid medical leave, Regents maintain that the statement about paid medical leave was connected to Wentworth's marital problems, which he had publicly discussed. Regents cite deposition testimony that Wentworth had discussed his marital problems with Hadler and perhaps Dalton. But there were other people present at the meeting, and Tiwon emailed her notes of the meeting to be distributed to all students in the department. Regents cite no evidence that the rest of the attendees at the meeting or the entire body of students in the department knew of Wentworth's marital problems. More importantly, even if everyone present at the meeting or who received the meeting notes knew of Wentworth's marital problems, Regents cite

37

nothing to suggest that everyone present knew that Hadler, the former department chair, had offered Wentworth a paid medical leave. The paid medical leave, as Hadler knew and as Regents argue in this appeal, was an accommodation connected to Wentworth's hospitalization and disability. Even if Hadler did not mention the disability itself, his description of the offered leave as medical revealed that Wentworth had some sort of serious medical condition, which could be inferred to be a mental condition beyond mere marital stress. Regents fail to demonstrate that the offer of paid medical leave was already known or the disclosure of it so inconsequential that it could have no adverse effect on him as a matter of law.

Regents also assert that the complaints to OPHD against Wentworth were already publicized in the media by the time of the meeting. There is no evidence in the record listing everyone at the meeting or documenting their knowledge about the media articles or OPHD investigations. Additionally, the notes of the meeting were later circulated to students in the department, and there is no evidence that all these recipients knew about the investigations. Even if they had, Dalton was the department chair, so his confirmation of the existence of the investigations could have an adverse effect on Wentworth despite the media reports.

Neither in the trial court nor on appeal have Regents contended that the different disclosures Wentworth alleges as IPA violations can be summarily adjudicated separately. (See *Blue Mountain Enterprises, LLC. v. Owen* (2022) 74 Cal.App.5th

537, 549 ["where two or more separate and distinct wrongful acts are combined in the same cause of action in a complaint, a party may present a summary adjudication motion that pertains to some, but not all, of the separate and distinct wrongful acts" because separate wrongful acts are actually separate causes of action].) The triable issues of fact as to the disclosures at the April 2016 meeting are therefore sufficient to require reversal of the summary adjudication of the entire invasion of privacy cause of action. But there is a factual dispute about the leaks of the March 2016 letter, too.

As with the disclosures at the April 2016 meeting, Regents do not dispute that the leaks of the letter to the San Francisco Chronicle and Daily Californian can be attributed to them. Instead, Regents argue they are not liable because the letter does not contain Wentworth's personal information and could only be connected to Wentworth because two of the complainants had already reported their experiences to the press.

The letter said there had been seven student complaints against a member of the department faculty, six complaints were dismissed or shut down by OPHD and deserved a fuller hearing than they had received, and the one complaint that went forward was not investigated promptly. It is undisputed that this referred to Wentworth. This information about Wentworth's employment by the department and the disciplinary proceedings against him constitutes his personal employment information. (See *Hurley v. Department of Parks & Recreation, supra,* 20 Cal.App.5th at p. 644.) Broughton's instruction to Dalton and

Hadler that the existence of the OPHD investigations into Wentworth was confidential also supports the conclusion that the letter to Dalton discussing those investigations contained Wentworth's confidential personal information. While Broughton testified that the letter was not confidential, she placed it in her locked files with confidential information about Wentworth, which supports Wentworth's position.

Although the letter does not mention Wentworth by name, protected "personal information" encompasses more than just an individual's name. (§ 1798.3, subd. (a).) The IPA prohibits the disclosure of personal information "in a manner that would link the information disclosed to the individual to whom it pertains." (§ 1798.24.) The letter was leaked to the San Francisco Chronicle and the Daily Californian in connection with articles about student complaints against Wentworth. Warnke investigated the story after learning about Wentworth's alleged behavior from Bennett and Gutierrez, so leaking the letter to Warnke would naturally connect it to Wentworth. Also, the San Francisco Chronicle article quotes Hadler and Tiwon as stating that they wanted to bring attention to the complaints mentioned in the letter. A reasonable jury could conclude from this evidence that Hadler, Tiwon, or someone else in the department leaked the letter to bring attention to Wentworth. It is also fair to infer that disclosure to the media of the letter and the investigations mentioned in it would have an adverse effect on Wentworth by giving official confirmation of the existence of the complaints and exposing the issue to the school and larger community. The

40

leaked letter, too, therefore supports Wentworth's IPA cause of action.[5]

### III. Discovery

#### *A. Additional background*

During discovery, Wentworth moved to compel Regents to produce, among other documents, communications between faculty or staff of the University of California, Berkeley Graduate School of Journalism and the San Francisco Chronicle, Melissa Batchelor Warnke, or the university vice provost which refer, pertain, or relate in any way to preparation or publication of the San Francisco Chronicle article about the complaints against Wentworth; communications between Warnke and anyone else relating to the investigation of, preparation for, and publication of the San Francisco Chronicle article; all documents gathered or examined to prepare the San Francisco Chronicle article, including materials Warnke reviewed; and documents relating to drafts, edits, or comments on the article. Regents refused to provide the requested documents, citing, among other objections, overbreadth and the reporter's privilege.

---

[5] Because we conclude that factual disputes related to Wentworth's IPA theory defeat Regents' request for summary adjudication of the invasion of privacy cause of action, we need not decide whether factual disputes also preclude summary adjudication of Wentworth's constitutional theory. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 744 [trial court did not err by refusing to summarily adjudicate one theory supporting cause of action because it found triable issue as to other theories supporting the cause of action mentioned in the motion].)

41

The trial court denied the motion to compel responses to these requests. It stated, "Although Plaintiff asserts the [requests for production of documents] are aimed at demonstrating that UC faculty members disclosed confidential information from Plaintiff's investigation and personnel file to the SF Chronicle, he does not seek documents falling within that description but instead seeks all communications, drafts, and documents examined and assembled in the course of a journalist's (Ms. Warnke's) preparation of an article or other journalists' (members of the UC School of Journalism) assistance in preparing that article. The court finds such requests overly broad and in violation of the First Amendment of the United States Constitution, as UC asserts." The trial court went on to conclude that the reporter's privilege under the First Amendment applied to the requests.

## B. Analysis

"In general, we review the trial court's ruling on a motion to compel discovery for an abuse of discretion, because the trial court is vested with wide statutory discretion to manage discovery. [Citation.] 'In addition, if the trial court reached its decision after resolving conflicts in the evidence, or inferences that could be drawn from the evidence, we review those factual findings to determine whether they are supported by substantial evidence. [Citation.]' [Citation]. [¶] However, 'where the propriety of a discovery order turns on statutory interpretation, an appellate court may determine the issue de novo as a question

42

of law.' " (*Pomona Valley Hospital Medical Center v. Superior Court* (2012) 209 Cal.App.4th 687, 692–693.)

Wentworth argues the trial court erred and that the First Amendment reporter's privilege does not protect the requested documents because Wentworth is suing Regents as his employer and seeking records of disclosures from Regents to the media, not seeking records from a journalist.  Regents do not respond to the substance of Wentworth's arguments.  Regents argue instead that the trial court cited both overbreadth and the First Amendment and Wentworth addressed only the First Amendment.  According to Regents, Wentworth's failure to address both grounds for the trial court's ruling requires affirmance of the trial court's order denying the motion to compel, "because 'one good reason is sufficient to sustain the order from which the appeal was taken.' " (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237.)

Regents' interpretation of the trial court's order is not persuasive.  Regents did object that Wentworth's document requests were "overly broad and indiscriminate as to time and scope."  Wentworth briefly addressed this objection in his motion papers, noting that the requests were limited in time and scope to the San Francisco Chronicle article.  Regents' opposition to the motion to compel ignored this objection and focused entirely on arguments that Wentworth's requests were barred by California's shield law (Cal. Const., art. I, § 2, subd. (b); see also Evid. Code, § 1070) and the federal constitutional reporter's privilege.  Regents' only mention of overbreadth in its opposition came in its

argument that the requests were overly broad because they would encompass Warnke's interview notes and communications with her sources, editors, and publisher, and published docs, which were protected by the shield law. Given that Regents essentially ignored the overbreadth objection after first asserting it, it would be unusual for the trial court to cite that objection as an independently sufficient ground for denying the motion to compel. This is especially true in light of the trial court's statement that the discovery requests were "overly broad and in violation of the First Amendment of the United States Constitution, *as UC asserts*." (Italics added.) Wentworth's interpretation of this statement is far more persuasive: the trial court meant only that the discovery requests were overly broad because they violated the First Amendment, just as Regents argued in its opposition to the motion.

But our resolution of the dispute as to the import of the trial court's order does not automatically entitle Wentworth to reversal of that order. As the appellant, Wentworth has the affirmative burden to demonstrate error. (*Jameson v. Desta, supra*, 5 Cal.5th at p. 609.) We must still consider whether the trial court erred in concluding that the reporter's privilege barred Wentworth's requests, despite the absence of any briefing on this point by Regents. (*Fleming Distribution Co. v. Younan* (2020) 49 Cal.App.5th 73, 84, fn. 8.)

"*Mitchell v. Superior Court* [(1984)] 37 Cal.3d 268 holds that there is a qualified journalist's privilege in a civil action to refuse to reveal confidential sources or information obtained from

44

those sources and that the scope of the privilege depends upon a weighing of five factors. [¶] The first is the nature of the litigation and whether the reporter is a party. 'In general, disclosure is appropriate in civil cases, especially when the reporter is a party to the litigation.' (37 Cal.3d at p. 279.) 'A second consideration is the relevance of the information sought to plaintiff's cause of action. . . . [M]ere relevance is insufficient to compel discovery; disclosure should be denied unless the information goes "to the heart of the plaintiff's claim." ' (*Id.* at p. 280.) Third, discovery should be denied unless the plaintiff has exhausted all alternative sources of obtaining the needed information. Fourth, the court should consider the importance of protecting confidentiality in the case at hand. (*Id.* at p. 282.) 'Finally, the court may require the plaintiff to make a prima facie showing that the alleged defamatory statements are false before requiring disclosure.' (*Id.* at p. 283.)" (*Anti-Defamation League*, *supra*, 67 Cal.App.4th at p. 1080.)

We find no abuse of discretion in the trial court's implied balancing of these factors. We need not discuss most of them because we conclude that even if they favored disclosure, the third factor alone would be sufficient to uphold the trial court's order. *Mitchell* instructed that a plaintiff must pursue all alternative sources because "[c]ompulsory disclosure of sources is the 'last resort' [citation], permissible only when the party seeking disclosure has no other practical means of obtaining the information." (*Mitchell v. Superior Court*, *supra*, 37 Cal.3d at p. 282; accord, *Shoen v. Shoen* (9th Cir. 1993) 5 F.3d 1289, 1296

45

["At a minimum," a demonstration of a sufficiently compelling need to overcome the privilege "requires a showing that the information sought is not obtainable from another source"].)
Wentworth propounded the discovery requests to establish exactly who leaked the March 2016 letter. He also wanted to discover who sent OPHD files to Warnke or the San Francisco Chronicle, since Warnke stated in an interview that she had reviewed "a ton, a ton, a ton of emails, notes from meetings, agendas, [and] the case files themselves" when researching the article. But neither in the trial court nor here has Wentworth offered any catalog of his efforts to exhaust alternative sources. Wentworth merely asserts that he directed the discovery requests to Regents, rather than directing them to non-party journalists. But his discovery requests did not seek communications by the individuals who signed the letter or other members of the SSEAS department who might have leaked it. Instead, he framed his requests to obtain communications with and within the journalism school, as well as notes and records from the school. Regents play a dual role here, responsible both as Wentworth's employer and as the journalism school, and Wentworth in no way attempted to minimize any intrusion on the journalism school.

Moreover, Wentworth could have tried to discover who gave the relevant materials to Warnke by deposing the various signers and recipients of the letter, as well as the sources named in the San Francisco Chronicle article. So far as the record reveals, as relevant here, Wentworth obtained testimony, either from depositions or the Academic Senate committee hearing, from the

46

six faculty who signed the letter, Edwards, Faruqui, Goldman, Hadler, Tiwon, and von Rospatt; Dalton, who received it; Broughton, to whom Dalton gave the original letter; Bennett, Gutierrez, and Hemenway, three of the student complainants; and Denise Oldham, the university's Title IX coordinator.[6]  This is a fairly comprehensive list of people who might have leaked the letter.  It appears Wentworth asked Dalton, Faruqui, Goldman, von Rospatt, and Gutierrez about leaking the letter, each of whom denied doing so.  But there is no indication that Wentworth asked the others about the letter.  Nor is there any indication that Wentworth asked anyone about providing case files to Warnke or the San Francisco Chronicle.

Wentworth's failure to submit evidence that he asked Bennett about providing case files or other information to Warnke is particularly surprising.  In support of his motion to compel responses to his discovery requests, he attached a copy of an email from an employee in Broughton's office notifying OPHD's director that Bennett would be bringing a friend to her interview for moral support.  The email named the friend as "Melissa Bachelor."  This suggests that Bennett was giving Warnke access to OPHD proceedings, which in turn raises the possibility that Bennett, who received a copy of the OPHD report, gave the report to Warnke.  At a minimum, absent evidence that

---

[6] The existence of two versions of the letter, one with four signatures and one with six, is immaterial here.  The record does not show exactly when the two additional faculty members signed the letter, so anyone who signed either version of the letter could have leaked it.

47

Wentworth exhausted all alternative sources of information regarding the letter and OPHD files, the trial court was within its discretion to deny his motion to compel.

*Anti-Defamation League*, *supra*, 67 Cal.App.4th 1072, which Wentworth cites, does not warrant a different outcome. The 17 plaintiffs in that case sued the defendant Anti-Defamation League of B'nai B'rith (ADL) for gathering and disclosing information about them in violation of the IPA. (*Id.* at pp. 1077–1078.) When the plaintiffs served demands for production of documents, ADL asserted the reporter's privilege. (*Id.* at p. 1079.) There was no dispute that ADL qualified as a journalist. (*Id.* at pp. 1079–1080.) The Court of Appeal held that ADL was immune to the IPA claims of 14 of the plaintiffs because they were limited-purpose public figures and ADL had obtained information about them through legitimate newsgathering. (*Id.* at pp. 1083, 1090–1091, 1093.) However, the court added the caveat that ADL would not be immune to any of the plaintiffs' claims to the extent that it disclosed information about them to foreign governments or anyone else for a non-journalistic purpose. (*Id.* at pp. 1093–1094.) As to the three plaintiffs who may not have been limited-purpose public figures, the Court of Appeal affirmed the trial court's ruling that those three plaintiffs had satisfied the *Mitchell* factors, including the exhaustion of alternative sources, and were entitled to discovery about non-public information about them in ADL's files and anyone to whom ADL disclosed such information. (*Id.* at pp. 1094, 1098.)

Wentworth argues that Regents, like ADL when it disclosed information to foreign governments, were not acting as journalists and therefore were not protected from discovery. This ignores Regents' dual role in this case and the fact that Wentworth framed his discovery requests to seek documents from Regents as the operator of the journalism school. Furthermore, even if the trial court could have found that Wentworth pursued all alternative sources of information, as did the trial court in *Anti-Defamation League*, that does not mean the trial court abused its discretion in implicitly making the contrary finding that he did not adequately pursue all alternatives.

## IV. Motion for retrial

### A. Additional background

Wentworth next challenges the trial court's denial of his motion for retrial of his cause of action for withholding personnel records. At the trial, the jury used a special verdict form with separate sections of questions for each cause of action, with instructions after each question telling the jury what question to answer next. Section E of the form addressed Wentworth's cause of action against Regents for failing to prevent harassment, discrimination, or retaliation. Section F addressed his cause of action for failing to produce his personnel file upon request. The first question in Section E, question No. 24, asked, "Did the University fail to take all reasonable steps to prevent the harassment, discrimination, and/or retaliation?" The jury placed an "X" next to "No." The instruction immediately following this stated, "If your answer to question 24 is yes, then answer

49

question 25. If you answered no, stop here, answer no further questions, *and proceed to Section F only if instructed to do so in a prior Section.*" (Italics added.) No prior sections in the verdict form told the jury to answer questions in Section F. The jury did not answer any questions in Section F.

After the jury sent its verdict to the court, the court clerk read it in open court. The clerk read the jury's "No" answer to question No. 24 and the form's instruction that the jury should then proceed to section F only if instructed to do so. The clerk noted that section F addressed the failure-to-produce-personnel-file claim and had no answers. The court then polled the jury by having the clerk read the answer to each question and asking the members of the jury if that was their verdict. All 12 members of the jury agreed that they had answered "No" to question No. 24. The trial court then noted, "Section F, Failure to Produce Personnel File. No questions were answered." Neither party raised any concern about the verdict, nor did they raise any issue when the trial court gave them an opportunity before discharging the jurors.

A few weeks later, Wentworth moved for retrial on the personnel records cause of action. Wentworth argued the jury's failure to render a verdict on that cause of action constituted a mistrial under Code of Civil Procedure section 616 and required a retrial. The trial court denied Wentworth's request for a retrial. It ruled that Wentworth forfeited his claim regarding the incomplete verdict form because he failed to object before the jury was discharged. Separate from the forfeiture finding, the trial

50

court also said it would exercise its discretion under section 616 and deny the request for a retrial because of Wentworth's failure to object. The court noted that there was no indication the jury failed to answer the questions regarding the personnel file cause of action because of mistake or accident, since it answered all other questions on the form. The court finally said that it did not find the merits of Wentworth's personnel file cause of action to be so clear that retrial was required.

### B. Analysis

Section 616 of the Code of Civil Procedure states, "In all cases where the jury are discharged without having rendered a verdict, or are prevented from giving a verdict, by reason of accident or other cause, during the progress of the trial, or after the cause is submitted to them, except as provided in Section 630, the action may be again tried immediately, or at a future time, as the court may direct." Section 630 governs motions for a directed verdict. "A plain reading of the statute shows that the court is granted the discretionary authority to act on motions for retrial under that provision. It is not required to grant a motion for retrial . . . . [¶] Accordingly, we review the trial court's order on a motion for retrial under the abuse of discretion standard." (*Virtanen v. O'Connell* (2006) 140 Cal.App.4th 688, 712.)

Wentworth argues that the jury's silence on the personnel file cause of action makes it an incomplete verdict that is tantamount to no verdict at all. In such circumstances, according to Wentworth, his cause of action remains pending and requires retrial. He contends the trial court erred in requiring him to

51

object to preserve the issue, based on *Irelan-Yuba Gold Quartz Mining Co. v. Pacific Gas & Elec. Co.* (1941) 18 Cal.2d 557 (*Irelan-Yuba*).  In that case, after a trial pitting several plaintiffs against Pacific Gas & Electric (PGE) and O'Brien Mines Inc. (O'Brien), the jury was given four different verdict forms:  one for a verdict in favor of both defendants, one for a verdict for the plaintiffs against both defendants, one for a verdict for the plaintiffs against PGE, and one for a verdict for the plaintiff against O'Brien.  (*Id.* at p. 569.)  The jury was told to sign only one verdict form, and it returned the verdict form for the plaintiffs against only PGE.  (*Ibid.*)  The Supreme Court agreed with the plaintiffs that the jury's failure to make a finding expressly in favor of O'Brien was a failure by the jury to find upon all of the issues.  (*Id.* at p. 570.)  The court rejected the notion that the plaintiffs were estopped to raise the issue by failing to ask the court to instruct the jury to retire and make a finding as to O'Brien.  (*Id.* at p. 571.)  The court stated, "The doctrine of waiver under the circumstances here involved means merely that if no objection is made to the verdict when it is returned, that objection is waived insofar as it may have been effectual as an attack on the verdict returned.  If all the issues are not determined by the verdict, but no objection is made thereto, then the verdict stands as to the issues included therein, but as to the remaining issues the matter is set at large and further proceedings should be had in the trial court to adjudicate those issues." (*Ibid.*)

Because Wentworth's jury delivered a complete verdict consistent with the instructions on the form, Wentworth's challenge is not a challenge to a silent verdict but rather an objection to the form of the verdict and the issues as determined by the verdict. *Irelan-Yuba* is therefore inapposite. The facts here more closely resemble those in *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228 (*Taylor*). There, the instructions on the special verdict form incorrectly told the jury to skip two questions about a hostile work environment sexual harassment cause of action. (*Id.* at p. 1240–1241.) The defendant had not detected the error when it approved the verdict form. (*Id.* at pp. 1242–1241.) The Court of Appeal affirmed the trial court's ruling that the defendant forfeited any claim that the special verdict was fatally defective because it failed to object before the jury was discharged. (*Id.* at p. 1242.) The court explained, " ' "Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected." [Citation.]' (*Keener v. Jeld–Wen, Inc.* (2009) 46 Cal.4th 247, 263–264, fn. omitted.) 'The obvious purpose for requiring an objection to a defective verdict before a jury is discharged is to provide it an opportunity to cure the defect by further deliberation. [Citation.]' [Citation.] 'The rule is designed to advance efficiency and deter gamesmanship.' (*Keener v. Jeld–Wen, Inc.*, *supra*, 46 Cal.4th at p. 264.) ' " ' " ' "If any other rule were to obtain, the party would

53

in most cases be careful to be silent as to his objections until it would be too late to obviate them . . . ." ' " ' " ' " (*Taylor,* at p. 1242, italics omitted.)  The defect in the *Taylor* verdict form was apparent and could have been corrected when the verdict was rendered, and the jury's failure to answer the relevant questions was clear when the jury was polled.  (*Id.* at pp. 1242–1243; cf. *Irelan-Yuba, supra,* 18 Cal.2d at p. 570 [a verdict that is silent as to one of two defendants constitutes a failure on the part of the jury to find upon all of the issues, but "[t]his rule is subject to the qualification that a verdict may be construed with reference to the instructions pursuant to which it was rendered"].)

The flaw in the verdict here is like that in *Taylor*, so we conclude, like *Taylor*, that the trial court properly found that Wentworth forfeited his challenge to the verdict on his personnel file cause of action by failing to raise the issue in the trial court. The jury properly followed the instructions on the verdict form, which told the jury not to answer the personnel file cause of action questions if it found Regents had not failed to take all reasonable steps to avoid discrimination.  Once the jury returned its verdict, it was clear from the reading of the verdict and the polling of the jury that the jury had not answered the questions regarding the personnel file cause of action.  Wentworth, as the plaintiff, was responsible for submitting a verdict form sufficient to support his causes of action.  (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 531.)  Wentworth therefore should have raised the issue and asked the trial court to instruct the jury to

54

answer the questions about the personnel file cause of action notwithstanding the instructions on the form. Neither in the trial court nor on appeal has Wentworth explained why he failed to raise the issue at the appropriate time. His failure to do so forfeited the issue. The policy rationale supporting the forfeiture rule applies with full force. The error could have been corrected easily if raised at the time, while correcting it now would be far more costly.[7]

Wentworth notes that the jurors in *Taylor* answered the verdict as presented to them, but he fails to recognize that the jury here did the same. Instead, he stresses that the *Taylor* court later remarked, in a separate section regarding harmless error, "If we had a legitimate doubt concerning prejudice, we would reverse." (*Taylor*, *supra*, 222 Cal.App.4th at p. 1246.) This statement does not detract from *Taylor*'s application of the forfeiture rule. *Taylor* made clear that its harmless-error analysis was an alternative holding, "[i]rrespective" of whether the defendant had forfeited the issue. (*Id.* at p. 1244.) *Taylor* nowhere conditioned its application of the forfeiture rule on the strength of the defendant's argument on the merits. Such a holding would make little sense, as it would mean that

---

[7] Even if Wentworth had not forfeited the issue, we would find no abuse of discretion in the trial court's discretionary decision not to order a retrial because of Wentworth's delay in raising the issue. (See *Virtanen v. O'Connell*, *supra*, 140 Cal.App.4th at p. 712 [retrial under Code Civ. Proc., § 616 is not mandatory].)

arguments could be forfeited only when a party would lose on the merits anyway, which is no forfeiture at all.

Regents raise a question about whether the absence of a jury ruling on the personnel file cause of action means there is no final judgment in this case, which would deprive this court of jurisdiction. They suggest we presume the trial court found that Wentworth forfeited and dismissed the personnel cause of action. There is no need to imply any such findings to achieve a final judgment. As set forth *ante*, the jury followed the verdict form's instructions correctly as written, which made the personnel file cause of action dependent on the failure to prevent discrimination cause of action. The jury's finding on the failure to prevent discrimination cause of action therefore disposed of the personnel file cause of action. Wentworth forfeited the right to object to the verdict form; he did not forfeit the cause of action itself. The judgment on the verdict was final and appealable.

## V. Attorney's fees and costs

### A. Additional background

Wentworth cited no legal authority when he requested copies of his personnel records in anticipation of litigation in April 2016. His original and first amended complaints cited Labor Code sections 226 and 1198.5 and Government Code section 31011 in support of the personnel file cause of action request. In his second amended complaint, filed in April 2018, Wentworth cited the IPA for the first time, but a different provision than supported his standalone invasion of privacy cause of action. Section 1798.34 gives individuals the right to

56

inspect personal information in an agency's files. Section 1798.34, subdivision (a) states that "each agency shall permit any individual . . . to inspect all the personal information in any record containing personal information and maintained by reference to an identifying particular assigned to the individual within 30 days of the agency's receipt of the request for active records, and within 60 days of the agency's receipt of the request for records that are geographically dispersed or which are inactive and in central storage. Failure to respond within these time limits shall be deemed denial."

Section 1798.46 governs relief in suits brought under section 1798.45, subdivision (a), which creates a private right of action for violations of section 1798.34, subdivision (a). Section 1798.46, subdivision (b) states that in such suits, "[t]he court shall assess against the agency reasonable attorney's fees and other litigation costs reasonably incurred in any suit under this section in which the complainant has prevailed. A party may be considered to have prevailed even though he or she does not prevail on all issues or against all parties."

After the trial, Wentworth filed a memorandum of costs and motion for attorney's fees based on section 1798.46.[8] He contended that he had prevailed on the personnel file cause of

---

[8] Section 1798.46, as the more specific statute, also controls over Code of Civil Procedure section 1032 on the question of costs. (*DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1147.) For simplicity our discussion focuses on the question of attorney's fees, but the same principles apply to costs.

action because Regents did not produce the file until after he had filed suit and after he had moved to compel responses to document requests in discovery.  Regents moved to strike the memorandum of costs and opposed the request for attorney's fees.

The trial court found Wentworth was not the prevailing party because he did not prevail on any claim at trial and the jury was silent on the IPA claim.  The court further found that Wentworth was not the prevailing party for fees under a catalyst theory.  The court concluded, "Ultimately, Plaintiff demonstrates, at best, a temporal correlation between Plaintiff's lawsuit and the production of certain records, but this Court finds that Plaintiff's lawsuit was not the cause of the production of records or, if the cause, the results were too insignificant to consider Plaintiff the prevailing party."  It noted that Wentworth did not raise the IPA until late in the litigation, by which point most of the records had been produced and the only remaining dispute related to the March 2016 letter.  The court also found that, assuming the March 2016 letter was subject to the IPA, the letter was insignificant to the lawsuit.  The court observed that Wentworth continued to litigate his employment claims for years after obtaining the March 2016 letter, it was not central to trial, and its production did not advance Wentworth's position on the merits.

## B. Analysis

Wentworth argues the trial court erred in finding he was not the prevailing party under section 1798.46, notwithstanding the fact that the jury did not rule in his favor on that cause of

action, because he obtained relief in a practical sense by obtaining the records during discovery in the litigation.

There are no published California cases construing the meaning of section 1798.46.  However, many other attorney's fees statutes use similar language awarding fees to prevailing parties, so we may look to them for guidance.  A party can generally claim prevailing party status for attorney's fees on two different theories.  First, a plaintiff can prevail by obtaining " 'a judicial resolution' [citation] or 'a judicially recognized change in the legal relationship between the parties.' " (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 260 [considering public interest fees request under Code Civ. Proc., § 1021.5]; see *Belth v. Garamendi* (1991) 232 Cal.App.3d 896, 901 & fn. 2 [considering request for fees under what is now Gov. Code, § 7923.115, part of Public Records Act, by analogy from case law under Code Civ. Proc., § 1021.5].)  If a party thus obtains some form of judicial action on a claim, the party can be considered the prevailing party even if the party did not prevail on every claim.  (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1345 [considering public interest fees request under Code Civ. Proc., § 1021.5].)  Section 1798.46, subdivision (b) embodies this principle, since it dictates that a "party may be considered to have prevailed even though he or she does not prevail on all issues or against all parties."  Success on any claim is assessed in a pragmatic sense by determining which party prevailed on a practical level.  (*Graciano v Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 145, 153 [considering fees request under

§§ 1780, subd. (d) and 2983.4, which are part of the Consumers Legal Remedies Act, § 1750 et seq., and the Automobile Sales Finance Act, § 2981 et seq.]; see Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 3d ed. 2010) § 2.45.)

Second, when a party does not obtain any favorable judicial action, the party "must obtain attorney fees under the catalyst theory, or not at all."  (*Vasquez v. State of California, supra,* 45 Cal.4th at p. 260; see Pearl, Cal. Attorney Fee Awards, *supra,* § 2.111.)  To prevail on a catalyst theory, a plaintiff moving for fees "must establish that (1) the lawsuit was a catalyst motivating the defendants to provide the primary relief sought; (2) that the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense . . . ; and (3) that the plaintiffs reasonably attempted to settle the litigation prior to filing the lawsuit." (*Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604, 608.) "To satisfy the first (causation) prong, the plaintiff need not show the litigation was the only cause of defendant's acquiescence. [Citation.]  The litigation need only be a ' "substantial factor" ' contributing to the relief obtained.  [Citations.] [¶] But the plaintiff cannot be a successful party by obtaining just any relief. [Citation.]  In catalyst cases, the plaintiff must show its lawsuit was a catalyst motivating the defendant to provide the *primary* relief sought in the litigation." (*Department of Water Resources Environmental Impact Cases* (2022) 79 Cal.App.5th 556, 572; accord, *Marine Forests Society v. California Coastal Com.* (2008)

60

160 Cal.App.4th 867, 878; *Lyons v. Chinese Hospital Assn.*, *supra*, 136 Cal.App.4th at pp. 1346–1348.)

Our remand on Wentworth's standalone invasion of privacy cause of action requires us to reverse the ruling on attorney's fees and costs. If Wentworth prevails at trial or otherwise on his invasion of privacy cause of action that we revive in this appeal, then the trial court could consider him to have prevailed, albeit in part. It could then award him attorney's fees based on the invasion of privacy cause of action, as well as the personnel file cause of action based on the IPA theory, to the extent the trial court concludes Wentworth achieved success in a practical sense. Any fees awarded could be commensurate with the limited scope of the victory, although the personnel cause of action could be more important to Wentworth's overall case if his victory on the invasion of privacy cause of action rests on disclosure of the March 2016 letter.

If Wentworth does not prevail on the invasion of privacy cause of action, his entitlement to fees will rest entirely on the catalyst theory. The trial court will then have to determine whether Wentworth's success in obtaining his personnel file during the litigation achieved his primary litigation objectives and whether the other catalyst theory criteria are met.

Whichever determination the trial court has to make, it should consider whether the theories for obtaining his personnel file that Wentworth pled and pursued in earlier stages of the litigation are interrelated, factually or legally, with the IPA theory that he ultimately pled and on which his request for

61

attorney's fees relies.  (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1133 ["litigation may involve a series of attacks on an opponent's case.  The final ground of resolution may become clear only after a series of unsuccessful attacks.  Compensation is ordinarily warranted even for those unsuccessful attacks, to the extent that those attacks led to a successful claim"]; *Graciano v. Robinson Ford Sales, Inc.*, *supra*, 144 Cal.App.4th at p. 153 [" 'Whether an [attorney fee] award is justified and what amount the award should be are two distinct questions, and the factors relating to each must not be intertwined or merged' "].)  The trial court should also consider the importance or significance of the entire personnel file to Wentworth's overall case, not just the significance of the March 2016 letter.

## DISPOSITION

The trial court's order granting summary adjudication of Wentworth's invasion of privacy cause of action is reversed.  The orders denying Wentworth's motion for attorney's fees and granting Regents' motion to strike Wentworth's memorandum of costs are reversed.  In all other respects, the judgment is affirmed.  This matter is remanded for further proceedings consistent with this opinion.

BROWN, P. J.

WE CONCUR:

GOLDMAN, J.

DOUGLAS, J.*

*Wentworth v. U.C. Regents* (A168296, A168861)

---

\* Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial court: | Alameda County Superior Court |
| Trial judge: | Hon. Robert D. McGuiness |
| | Hon. Jeffrey S. Brand |
| Counsel for Plaintiff and Appellant: | ARENA HOFFMAN LLP |
| | Michael Hoffman |
| | Ronald D. Arena |
| Counsel for Defendant and Respondent: | HORVITZ & LEVY LLP |
| | H. Thomas Watson |
| | Karen M. Bray |
| | GORDON REES SCULLY MANSUKHANI LLP |
| | Marie Trimble Holvick |
| | Amber A. Eklof |